## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JOHN MARION GRANT,          ) | |
|             ) | |
|        Petitioner,         ) | |
|             ) | |
| v.                       ) | Case No. 05-CV-0167-TCK-TLW |
|             ) | |
| RANDALL G. WORKMAN, Warden,   ) | |
| Oklahoma State Penitentiary,       ) | |
|             ) | |
|        Respondent.       ) | |

## OPINION AND ORDER

This matter comes before the Court on a Petition for Writ of Habeas Corpus (Dkt. # 12) filed by Oklahoma death row inmate John Marion Grant, pursuant to 28 U.S.C. § 2254. Grant, who appears through counsel, challenges his conviction and sentencing in Osage County District Court, Case No. CF-99-28. Respondent filed a Response (Dkt. # 18), Grant filed a Reply to the Response (Dkt. # 24), and Respondent also submitted a Response to the allegations of inadequate state procedural bar contained within Grant's Reply (Dkt. # 28-1). Grant also submitted a Supplement to his Petition (Dkt. # 39; see also Dkt. # 38 (Order construing Grant's "Amended Petition" as a supplement to his Petition)). Respondent filed a Response to the Supplement (Dkt. # 42) and Grant submitted a Reply (Dkt. # 45). The state court record has been produced.[1] The Court considered all of these materials in reaching its decision. For the reasons discussed below, the Court finds the Petition should be denied.

---

[1] References to documents and pleadings from these proceedings shall be referred to by docket number, where feasible (Dkt. # __); references to the trial transcript shall be referred to as "Tr. Vol. __ at ___"; references to the evidentiary hearing held by the trial court on remand from the Oklahoma Court of Criminal Appeals on February 22, 2002 shall be referred to as "Tr. Evid. at __." The original state court record shall be identified as "O.R. ___."

As a preliminary matter the Court notes that Randall G. Workman is now the Warden at Oklahoma State Penitentiary. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court finds that Randall G. Workman is the proper substituted Respondent and the Court Clerk shall be directed to note such substitution on the record.

## BACKGROUND

I.    **Factual Background**

Pursuant to 28 U.S.C. § 2254(e)(1), the historical facts found by the state court are presumed correct. In considering the issues presented in the Petition, the Court relied upon the following synopsis from the Oklahoma Court of Criminal Appeals ("OCCA") in that court's first opinion on direct appeal. Following review of the record, trial transcripts, trial exhibits, and other materials submitted by the parties, the Court finds this summary by the OCCA is adequate and accurate. Therefore, the Court adopts the following summary as its own:[2]

> On November 13, 1998, Grant savagely and repeatedly stabbed Gay Carter, a food service supervisor at the Connor Correction[al] Center in Hominy, Oklahoma. Grant used a prison-made "shank" similar to a sharpened screwdriver. Grant was serving a total of one-hundred thirty (130) years for four separate armed robberies and had been in prison for about twenty years prior to this offense. On a previous stay at Connor Correctional Center, Grant had worked in the kitchen and he knew Carter; however, Grant lost this job because he was fighting with another inmate.
>
> The morning of and the morning before this murder, Grant and Carter argued over the breakfast tray served to Grant. The previous morning Grant told Carter, "I'll get you bitch," and the morning of the murder Grant stated, "Your [sic] mine." Inmates Jerry James and Ronald Kuykendall, who held jobs in the dining area, witnessed these arguments.

---

[2]    Additional facts, apparent from the record, may be presented throughout this opinion as they become pertinent to the Court's analysis. In particular, facts summarized by the OCCA in its opinion issued after remand from the United States Supreme Court are also presumed correct unless rebutted by Grant by clear and convincing evidence, pursuant to 28 U.S.C. § 2254(e)(1).

After the last argument, James and Kuykendall saw Grant loitering in a storage area where cleaning supplies were kept, adjacent to the main dining area. Carter left the dining area to go to another building where the kitchen was located. When she returned, Grant grabbed her and pulled her into a mop closet. Inside the closet, Grant stabbed Carter numerous times in the chest while holding her mouth closed.

Witnesses summoned Sergeant Daniel Gomez, the first Correctional Officer to arrive. Gomez saw Grant still struggling with Carter. Grant then stood up and faced Gomez, looked at him with a vacant stare, and ran across the dining hall to the storage room, while still carrying the shank in his hand. Grant shut the door, closing himself inside.

After Grant left the mop closet, medical personnel arrived to aid Carter. They found that she was not breathing, and they could not find any vital signs. Carter was transported to the hospital, but efforts to revive her were unsuccessful. Medical Examiner Robert Hemphill determined that Carter died as a result of sixteen stab wounds. Carter's aorta was punctured, causing rapid blood loss resulting in her death.

The storage room to where Grant fled, has a wire mesh ceiling through which Correctional Officer Tony Reeves observed Grant. Grant ignored orders to lie down on the floor. Grant held the shank to his chest and ran into the wall, apparently in an attempt to stab himself. A special team of correctional officers entered the storage room and Grant made stabbing motions toward the officers. The officers were able to subdue Grant with the use of an electrical shock device.

Grant v. State,  58 P.3d 783, 789 (Okla. Crim. App. 2002), vacated, Grant v. Oklahoma, 540 U.S. 801 (2003).

## II.     Procedural History

Grant challenges his conviction and sentencing in Osage County District Court Case, No. CF-99-28. He was tried by jury and convicted of first degree murder. The jury found the following three aggravating circumstances:  "The defendant was previously convicted of a felony involving the use or threat of violence to the person"; "The murder was committed by a person while serving a sentence of imprisonment on conviction of a felony"; and "The existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to

3

society." See id. at 788 (citing Okla. Stat. tit. 21, § 701.7). The jury recommended a death sentence. In accordance with the jury's recommendation, the Honorable J.R. Pearman sentenced Grant to death.

On direct appeal, Petitioner raised fifteen propositions of error. The OCCA affirmed his conviction and sentence. Grant v. State, 58 P.3d 783 (Okla. Crim. App. 2002) ("Grant I").Grant subsequently filed an application for post conviction relief, which was denied in an unpublished decision on April 14, 2003 in OCCA Case No. PCD-2002-347.

On October 6, 2003, in Grant v. Oklahoma, 540 U.S. 801 (2003), the United States Supreme Court granted Grant's petition for writ of certiorari, vacated the judgment, and remanded the case back to the OCCA for further consideration in light of Wiggins v. Smith, 539 U.S. 510 (2003).

On remand, the OCCA again affirmed the judgment and sentence of the trial court determining no relief was required based on the application of Wiggins to Grant's case. Grant v. State, 95 P.3d 178 (Okla. Crim. App. 2004) ("Grant II").

On March 25, 2005, Petitioner initiated this habeas corpus proceeding with the filing of a Motion for Appointment of Counsel (Dkt. # 1). Grant's Petition (Dkt. #12) was filed October 20, 2005, challenging Petitioner's judgment and sentence of death. Grant identifies the following twelve (12) grounds for relief:

> Ground I:　　Trial counsel's failure to investigate and present readily available evidence in mitigation about neglect and abuse suffered by Mr. Grant as a child denied Mr. Grant effective assistance of counsel in violation of the Sixth, Eighth, and Fourteenth Amendments.
>
> Ground II:　　Mr. Grant was denied rights conferred by state law in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution when the trial court failed to excuse a venireperson for cause and Mr. Grant was required to expend a peremptory challenge to cure the trial court error.

4

| | |
|---|---|
| Ground III: | The state used a "human shackle" to restrain Mr. Grant before the jury venire violating his right to a fair trial as protected under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. |
| Ground IV: | In violation of the Eighth and Fourteenth Amendments, Mr. Grant was denied a fair and reliable sentencing when the trial court found, and the OCCA affirmed, that evidence sufficient to support instruction on an insanity defense was insufficient to support instructions on the lesser included offenses of second degree murder or manslaughter. |
| Ground V: | Using Mr. Grant's prior convictions to support two aggravating circumstances was duplicative and skewed the jury's balancing of aggravating and mitigating factors violating Mr. Grant's rights as protected by the Fifth, Eighth, and Fourteenth Amendments. |
| Ground VI: | The victim impact evidence which explicitly called for Mr. Grant's execution exceeded what is constitutionally permissible and violated Mr. Grant's right to a fundamentally fair sentencing proceeding guaranteed by the Fifth, Eighth and Fourteenth Amendments. |
| Ground VII: | The continuing threat aggravator is unconstitutional on its face and as applied and its application in this case rendered Mr. Grant's sentence of death invalid as violative of the requirements for an individualized sentencing determination set forth in the Eighth and Fourteenth Amendments to the United States Constitution. |
| Ground VIII: | In violation of the Sixth and Fourteenth Amendments, Mr. Grant's right to confront the witnesses against him was abridged when he was denied full cross-examination of State's witness Fred Smith. |
| Ground IX: | All factual findings essential to the jury's authority to impose the death penalty were not made beyond a reasonable doubt as required by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. |
| Ground X: | Second stage instructions which failed to make the jury's consideration of mitigation evidence mandatory violated Mr. Grant's rights to a fair and reliable sentencing proceeding as protected by the Eighth and Fourteenth Amendments. |

Ground XI:          The accumulation of error deprived Mr. Grant of due process of law
                    and a reliable sentencing proceeding in violation of the Fifth, Eighth,
                    and Fourteenth Amendments.

Ground XII:         The State Of Oklahoma proposes to execute Mr. Grant by lethal
                    injection using protocols which violate the Fifth, Eighth and
                    Fourteenth Amendments.

After initiation of this habeas corpus proceeding, Grant filed a second application for post-

conviction relief which was denied in an unpublished decision on November 6, 2006 in OCCA Case

No. PCD-2006-690.  After entry of the OCCA's decision, Grant filed his Supplement to his Petition

(Dkt. # 39) to expand upon his ground two claim to include arguments raised in his second

application for post-conviction relief.

The Court's ruling on each of Grant's claims is discussed below.

## GENERAL CONSIDERATIONS

## I.     Exhaustion

Generally, federal habeas corpus relief is not available to a state prisoner unless all state

court remedies have been exhausted prior to the filing of the petition. 28 U.S.C. § 2254(b)(1)(A);

Harris v. Champion, 15 F.3d 1538, 1554 (10th Cir. 1994); see also Wainwright v. Sykes, 433 U.S.

72, 80-81 (1977) (reviewing history of exhaustion requirement). In every habeas case, the Court

must first consider exhaustion. Harris, 15 F.3d at 1554. "States should have the first opportunity to

address and correct alleged violations of state prisoner's federal rights." Coleman v. Thompson, 501

U.S. 722, 731 (1991) (explaining that the exhaustion requirement is "grounded in principles of

comity").  In most cases, a habeas petition containing both exhausted and unexhausted claims is

deemed a mixed petition requiring dismissal. Where it is clear, however, that a procedural bar would

be applied by the state courts if the claim were now presented, the reviewing habeas court can

conduct a procedural bar analysis instead of requiring exhaustion. Coleman, 501 U.S. at 735 n.1 (citations omitted). Respondent contends that some of Grant's claims are unexhausted. Therefore, the Court will address the threshold question of exhaustion as it arises in each ground.

## II.      Procedural Bar

The Supreme Court has considered the effect of state procedural default on federal habeas review, giving strong deference to the important interests served by state procedural rules. See, e.g., Francis v. Henderson, 425 U.S. 536 (1976). Habeas relief may be denied if a state disposed of an issue on an adequate and independent state procedural ground. Coleman, 501 U.S. at 750; Medlock v. Ward, 200 F.3d 1314, 1323 (10th Cir. 2000). A state court's finding of procedural default is deemed "independent" if it is separate and distinct from federal law. Ake v. Oklahoma, 470 U.S. 68, 75 (1985); Duvall v. Reynolds, 139 F.3d 768, 796-97 (10th Cir. 1998). If the state court finding is "strictly or regularly followed" and applied "evenhandedly to all similar claims," it will be considered "adequate." Maes v. Thomas, 46 F.3d 979, 986 (10th Cir. 1995) (citing Hathorn v. Lovorn, 457 U.S. 255, 263 (1982)). To overcome a procedural default, a habeas petitioner must demonstrate either: (1) good cause for failure to follow the rule of procedure and actual resulting prejudice; or (2) that a fundamental miscarriage of justice would occur if the merits of the claims were not addressed in the federal habeas proceeding. Coleman, 501 U.S. at 749-50; Wainwright, 433 U.S. at 91.

## III.     Standard of Review - AEDPA

Grant's  habeas proceedings in the instant matter commenced well after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), thus, this Court's review is governed by the AEDPA.  Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007).  Under the

AEDPA, the standard of review applicable to each claim depends upon how that claim was resolved by the state courts. <u>Alverson v. Workman</u>, 595 F.3d 1142, 1146 (10th Cir. 2010) (citing <u>Snow</u>, 474 F.3d at 696). When a state court has adjudicated a claim, a petitioner may obtain federal habeas relief only if the state decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"[3] or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." <u>See</u> 28 U.S.C. § 2254(d)(1)(2); <u>Williams v. Taylor</u>, 529 U.S. 362, 402 (2000); <u>Neill v. Gibson</u>, 278 F.3d 1044, 1050-51 (10th Cir. 2001). When a state court applies the correct federal law to deny relief, a federal habeas court may consider only whether the state court applied the federal law in an objectively reasonable manner. <u>See</u> <u>Bell v. Cone</u>, 535 U.S. 685, 699 (2002); <u>Hooper v. Mullin</u>, 314 F.3d 1162, 1169 (10th Cir. 2002). It is not necessary, however, that the state court cite to controlling Supreme Court precedent, so long as neither the reasoning nor the result of the state court decision contradicts Supreme Court law. <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002). Additionally, the "determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## **GROUNDS FOR RELIEF**

### I.      **Ineffective Assistance of Counsel (Ground 1)**

Grant claims that his trial counsel's failure to investigate and present mitigating evidence regarding Grant's troubled childhood denied him effective assistance of counsel in violation of the

---

[3]      A legal principle is "clearly established" within the meaning of this provision only when it is embodied in a holding of the Supreme Court. <u>See</u> <u>Carey v. Musladin</u>, 549 U.S. 70, 74 (2006).

Sixth, Eighth and Fourteenth Amendments.  Grant contends that trial counsel failed to adequately investigate and present mitigating evidence from members of his family. Respondent argues that the OCCA's determination that Grant did not receive ineffective assistance of counsel was not contrary to, or an unreasonable application of, established federal law.  See Dkt. # 18 at 6.

Only two witnesses testified in the penalty phase of Grant's trial. No family members were called on Grant's behalf.  Grant briefly testified about his life, stating only that he was a middle child of a large family and that he had been incarcerated for most of his life beginning when he was an adolescent.   Tr. Vol. VI at 1564-75.   Daryl Shriner, a Department of Corrections ("DOC") psychiatrist who had never examined Grant, reviewed DOC records and testified that Grant never received mental health treatment while in DOC custody.  Tr. Vol. VI at 1586. Grant's trial counsel also incorporated the first stage testimony of Dr. Dean Montgomery. Tr. Vol. VI at 1604-05.  Dr. Montgomery testified that, in his opinion, Mr. Grant suffered from a borderline personality disorder which would cause Grant to behave in a manner similar to psychotic patients from time to time, especially when under stress. Tr. Vol. V at 1348-49.  Dr. Montgomery also cursorily  testified regarding Grant's childhood. He stated that Grant was the sixth of nine children, that Grant functionally never knew his father, and that he grew up "hanging around a bunch of other rather antisocial hard living guys." Id. at 1331-32.  Dr. Montgomery also briefly mentioned Grant's incarceration as an adolescent. Id. at 1332.

A.      Standards

Grant's claim of ineffective assistance is governed by the familiar two-part test announced in Strickland v. Washington, 466 U.S. 668, 687 (1984). Under that test, Grant must demonstrate that (1) defense counsel's performance was constitutionally deficient (i.e., it fell below an objective

standard of reasonableness), and (2) there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different.  See id.

> Because [the adversarial] testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies, [the Supreme Court has] noted that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."

Kimmelman v. Morrison, 477 U.S. 365, 384 (1986) (quoting Strickland, 466 U.S. at 691). Unquestionably, counsel's obligation to conduct reasonable investigations extends to matters related to the sentencing phase of trial. See Cooks v. Ward, 165 F.3d 1283, 1294 (10th Cir. 1998). "Indeed, [the Tenth Circuit has] recognized a need to apply even closer scrutiny when reviewing attorney performance during the sentencing phase of a capital case." Id. Where counsel's alleged failure to investigate and present evidence pertains to the sentencing phase of trial, the prejudice inquiry is whether there is a "reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695; see also Cooks, 165 F.3d at 1296 (requiring court to consider strength of government's case and aggravating factors jury found to exist, as well as mitigating factors that might have been presented).

A defense attorney "has a *duty* to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." Brecheen v. Reynolds, 41 F.3d 1343, 1366 (10th Cir. 1994) (emphasis in original) (quoting Middleton v. Dugger, 849 F.2d 491, 493 (11th Cir. 1988)); see also Stouffer v. Reynolds, 168 F.3d 1155, 1167 (10th Cir. 1999) (noting that defense counsel has a duty to investigate all possible lines of defense). The Strickland Court recognized that when evaluating the performance of defense counsel:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 690-91; see also Brecheen, 41 F.3d at 1368 ("[A]n attorney must have chosen not to present mitigating evidence after having investigated defendant's background."); Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991) ( "[O]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.").

   B.   *Evidentiary Hearing*

Grant raised this issue in his direct appeal to the OCCA and sought an evidentiary hearing on the issue.  See Appl. For Evidentiary Hr'g, Case No. D-2000-653.  In his application, Grant summarized the evidence that his family members and his cellmate in prison would be able to present in court. See id. at 7-9 and Exs. A-J.  The OCCA granted the evidentiary hearing with respect to Grant's claim that he received ineffective assistance of trial counsel due to his counsel's failure to develop and present available mitigating evidence from members of Grant's family[4] and remanded the case to the trial court for a hearing limited solely to this issue. See Order Remanding for Evidentiary Hr'g, Case No. D-2000-653. In order to grant the evidentiary hearing, the state

---

[4]     The OCCA found that Grant's cellmate should not be permitted to testify because "Scott is not a member of Grant's family, and his affidavit contains no information relating to Grant's claim about mitigating family and childhood evidence." See Order Remanding for Evidentiary Hr'g, Case No. D-2000-653, at 1, n.1.

appellate court was required to find and did find that Grant had shown "by clear and convincing evidence that there is a strong possibility his trial counsel was ineffective for failing to develop and present mitigating evidence from members of [his] family." See id.; see also Rule 3.11(B)(3)(b)(i), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18 App. (1998). The OCCA directed the trial court to make findings about (1) the availability of the evidence and witnesses presented at the evidentiary hearing, (2) the probable effect of these witnesses and evidence if they/it had been presented at trial, (3) whether the failure to develop and present these witnesses and this evidence was a matter of trial strategy, and (4) whether the evidence and witnesses would have been cumulative or would have affected the jury's sentencing determination. See Rule 3.11(B)(3)(b)(iii). The district court was also directed to determine whether Grant waived his right to present mitigating evidence from his family, and if so, whether the waiver was knowing and intelligent. See Order Remanding for Evidentiary Hr'g, Case No. D-2000-653.

The evidentiary hearing was held on February 22, 2002. At the evidentiary hearing, Grant presented the testimony of all nine of the family members whose affidavits were attached to Grant's application for an evidentiary hearing. These family members are related to Grant as follows: Ruth L. Grant (mother), Walter Grant (father), Clayton Black (maternal uncle), Ronnie Grant (older brother), LaRonda Hovis (oldest sister), Ruth Ann Grant Burley (older sister), Andrea Grant (younger half-sister), Gregory Grant (younger half-brother), and O.C. Frazier (youngest half-brother). Of these nine family members, six traveled from their homes in or near Portland, Oregon to attend the hearing. All nine family members testified that they were never contacted by defense counsel regarding Petitioner's trial, but that they would have testified if they had been asked to do so. See Tr. Evid. at 18, 38, 48, 73-74, 83, 92-93, 100, 109, 122-23. Everyone said that they

cared for Petitioner, recounted fond memories of him and testified that they would have asked the jury not to give Petitioner the death penalty.  Tr. Evid. at 18, 19, 34-39, 48, 74, 80, 84, 90, 93, 100-01, 110, 117, 123.

Of the nine witnesses, four lived at the same addresses as they did at the time of trial. Tr. Evid. at 5, 77, 91, 103.  Of the five that had moved since trial, three of them testified that they were living in the Portland area near other relatives at the time of trial.  Tr. Evid. at 29, 70, 113-14.  Only O.C. testified that he had ever had an unlisted telephone number, but he testified that his mother, Ruth Grant, had his phone number at all times.  Tr. Evid. at 114-15.  The other witnesses similarly indicated that Ruth Grant always maintained contact with her children and could provide their addresses and phone numbers. Tr. Evid. at 87, 93-94.

Petitioner's family members testified that Petitioner's father left home before he was born. Ruth Grant never received support from Petitioner's father or any of the other men who fathered her children.  Tr. Evid. at 6-9.  Petitioner's father was essentially absent from his life.  Tr. Evid. at 45-47, 49-51.  With no one to help raise her children and no support from their fathers, Ruth and her nine children lived in poverty.  Tr. Evid. at 30. LaRonda stated that they were "dirt poor." Tr. Evid. at 30. When John was a child, his family lived in a house in Ada, OK with no plumbing and did not have a car.  Tr. Evid. at 31.  Their sole support was government assistance and Mrs. Grant's part time work as a house maid.  Tr. Evid. at 8.  Much of the responsibility of raising the younger children including Petitioner fell to the oldest daughters.  Tr. Evid. at 9, 31-32.

Grant's family described him as a sensitive, quiet, respectful boy who loved pets, animals, drawing and cars. Tr. Evid. at 6-9, 32-34, 80, 89-90, 97-99.  His family testified that he was never

violent or abusive to anyone in the household. Tr. Evid. at 34-35, 70-72, 79-80, 97-99.  He was protective of his younger siblings. Tr. Evid. at 82, 104-106, 116-118.

     Petitioner's family members testified that he was always different from the other children, even when he was an infant.  He was a sensitive child who needed more care and attention than he received. Tr. Evid. at 32-33, 79-80.  Many of his family members recalled that Petitioner cried a great deal as a child. Tr. Evid. at 9, 33, 72, 90-90A.  However, Petitioner never received help for his problems. Tr. Evid. at 9.  Petitioner's problems got worse after the family moved from Ada to Oklahoma City.  Tr. Evid. at 11.  The neighborhood was rough and dangerous and eventually the family moved to the projects. Tr. Evid. at 11, 13, 71, 88.  He was bused to school. Tr. Evid. at 11. Petitioner started stealing to provide his younger brothers and sisters clothes and shoes. Tr. Evid. at  80-81, 117-18. Even before he was a teenager, Petitioner was in trouble with the law and was placed in a series of juvenile institutions. Tr. Evid. at 10-13.

The degree of contact that each family member had maintained with Petitioner during his long years of incarceration varied, with his mother and uncle visiting him on approximately an annual basis (Tr. Evid. at 16-17, 90A), some visitation by siblings LaRonda, Ruth Ann, Andrea, and O.C. (Tr. Evid. at 40, 72-73, 82, 120, 124), and communication by letter and telephone by Ronnie and Gregory (Tr. Evid. at 99, 109).

Grant's trial counsel, James Bowen, testified at the evidentiary hearing that he had spoken with Grant several times about his family but that Grant did not provide him with the specific contact information for his family except that many of them lived in Oregon. Tr. Evid. at 55.  He stated that Grant had indicated that he did not really want his family to be involved and that Grant had said that he had not kept in close contact with his family since he had been incarcerated. Tr.

14

Evid. at 54-55.  Bowen testified that he was concerned that if called to testify, the family would be vulnerable on cross examination due to that fact that they had not maintained a relationship with Grant.  Tr. Evid. at 55.  He testified that two different investigators (Steve Leedy and John Remington) worked on Grant's case and that his client's lack of enthusiasm notwithstanding,  he directed these investigators to try to locate members of Grant's family.  Tr. Evid. at 55-56. Bowen stated that he would not have allowed Grant's views about his family or his own concern that he might not be able to use the family member's testimony at trial to limit his investigation into Grant's childhood. Tr. Evid. at 58, 63. Bowen conceded that he had never talked to any of Grant's family and was never in a position to tell Grant what any of them might say if they testified. Id. at 59-60. At no time did trial counsel feel that he needed to bring Grant before the trial court to waive the presence of his family members as mitigating witnesses, and he would not have done so unless his client had objected to using them after they had been found. Tr. Evid. at 60-61.  Trial counsel vacillated between saying that he did not know whether either of the investigators ever found any family members and saying that he knew that they were not able to do so. Tr. Evid. at 56.  Counsel acknowledged that Grant brought him an envelope during the trial with his mother's name and a local return address on it, and that he gave the letter to Investigator Remington to attempt to contact her, but stated that he did not know what happened in that regard. Tr. Evid. at 63.  He testified that Grant did give him names of some of his relatives and that he thought he gave these names to the investigators. Id. at 68.  Trial counsel also acknowledged that Grant's DOC records were gathered and reviewed but did not recall whether any current addresses were contained within them.  Tr. Evid. at 63, 66-68.  Trial counsel testified that he never asked for a continuance to find any of Grant's relatives.  Id. at 69.

15

The stipulation of facts filed by the parties on March 4, 2002, included the affidavits of investigators John Remington, Steven Leedy and Dorothy Buckmaster. <u>See</u> Affidavits of Remington, Leedy and Buckmaster, appended to the Stipulation of Facts by the Parties, Dist. Ct. Osage County, Case No. CF-99-28 (Mar. 12, 2002). In their affidavits, Remington and Leedy discussed the steps that they normally take in an investigation for a trial. They acknowledged being assigned to Grant's case as trial investigators, and both acknowledged visiting with him, but neither had much specific information about what they actually did in Grant's case. In her affidavit, Buckmaster stated that a former Oklahoma Indigent Defense System (O.I.D.S.) investigator named Dave Presson had performed some preliminary work in the appellate investigation before she was assigned to the case and that Presson has prepared a witness log including the names, addresses, and telephone numbers of the members of Grant's family. She also found a handwritten list of family members and their addresses purportedly written by Grant's mother. Using this information, Buckmaster had no problem contacting Ruth Grant or other family members. She also had a conversation with Grant in which he discussed his family and background without hesitation and informed her that his Oklahoma contact for his family was his uncle, Clayton Black, who lived in Oklahoma City and whose telephone number was in the telephone book. Attached to Buckmaster's affidavit are Grant's prison records that she obtained from the DOC and from trial counsel's file providing addresses and telephone numbers for various members of Grant's family.

On March 27, 2002, the trial court issued its findings of fact and conclusions of law as directed by the OCCA. <u>See</u> Trial Court's Finding of Fact and Conclusions of Law, Case No. D-2000-653. The trial court specifically found that all nine family members "were findable and would have testified at trial if they had been asked." <u>Id.</u> at 2. It also found that "Defendant's mother is the

only one of the nine that kept regular contact with him" and that all nine family members "stated they would stay in close, personal contact with defendant in the future if his life was spared." Id. at 2-3. The trial court also found that "trial counsel did little to develop the mitigating evidence" that these persons could have offered. Id. at 4. Nevertheless, the trial court also concluded that "[n]ot calling family members to testify at trial was trial strategy and not an oversight on trial counsel's part." Id. at 3. In addition, the trial court found that Grant did not waive the presentation of mitigating evidence from members of his family. Id. at 4.

C.     State Court's Opinion on Direct Appeal

Subsequent to the evidentiary hearing, the OCCA rendered its decision in Grant's direct appeal rejecting Grant's claim that his trial counsel was ineffective. The OCCA agreed with the trial court "that the family members could have been contacted with the use of information located in Grant's prison records and they would have been willing to testify at trial." Grant I, 58 P.3d at 799. However, it found that "Grant's wish to exclude his family from the proceedings controlled trial counsel's actions in this case." Id. at 800. The state court concluded that "counsel's performance was not deficient" and that "[e]ven if he had shown deficient performance, Grant could not show that he was prejudiced by the failure to present this evidence." Id.[5]

---

[5]     Judge Chapel of the OCCA filed a spirited dissent from the OCCA's opinion on this ground. Judge Chapel noted that "under the circumstances of this case, trial counsel could not have reasonably decided that testimony from members of Grant's family would not be helpful, unless he had first located and interviewed at least some of them" and concluded that counsel did not provide adequate assistance. Grant I, 58 P.3d at 806. Judge Chapel also concluded that Grant established he was prejudiced by counsel's deficient performance and that the case should be remanded for resentencing. Id. at 809.

D.       *United States Supreme Court Grants Certiorari and Reverses Death Sentence*

Grant subsequently filed an application for post conviction relief, which was denied.  See

Order Denying Post-Conviction Relief, No. PCD-2002-347 (April 14, 2003). On October 6, 2003,

in Grant v. Oklahoma, 540 U.S. 801 (2003), the United States Supreme Court granted Grant's

petition for writ of certiorari, vacated the judgment, and remanded the case back to the OCCA for

further consideration in light of its recent decision in Wiggins v. Smith, 539 U.S. 510 (2003).[6]

E.       *State Court's Opinion on Remand*

On remand the OCCA again considered Grant's ineffective assistance of counsel claim, this

time in light of Wiggins, and again rejected the claim.  Grant II, 95 P.3d at 180-81. The OCCA

began by factually distinguishing Wiggins' background from Grant's. Id. The state court ultimately

concluded as follows:

> In our original opinion, we found that counsel's failure to contact family
> members did not fall "outside the wide range of professionally competent
> assistance." Furthermore, we held that Grant could not show that the failure to
> present the testimony of family members rendered his sentence unreliable. Grant
> could not show that he was prejudiced by counsel's conduct. While counsel could
> have contacted family members through Grant's prison records, and did ask an
> investigator to attempt to contact the family, no contact was ever made.
>
> The Wiggins case does not change our decision. Counsel's decision in this
> case was driven by Grant's own request to not have his family contacted. Counsel's
> concern that the family members' testimony showing care for Grant would be
> overshadowed by their actions of limited contact during the past twenty years of his
> life was a valid concern. Counsel's decision was directed by his client. His
> knowledge of Grant's early life, through conversations with Grant, would not have
> been enhanced by interviewing family members. The Court in Wiggins emphasized,

---

[6]       In Wiggins, the Supreme Court found that Kevin Wiggins was entitled to habeas corpus
relief, because "his attorneys' failure to investigate his background and present mitigating
evidence of his unfortunate life history at his capital sentencing proceedings violated his
Sixth Amendment right to counsel." See 539 U.S. at 514, 527, 536-37. Wiggins will be
discussed in detail below.

18

"Strickland does not require counsel to investigate every conceivable line of mitigation evidence no matter how unlikely the effort would be to assist the defendant at sentencing." Counsel in this case followed the directions of his client and made a reasonable decision that investigation into Grant's family history by contacting family members was unnecessary.

There are probably only few death penalty cases where counsel would not be ineffective for a failure to undertake an independent investigation of a defendant's early life by contacting family members. This is one of them. The factors that make counsel's independent investigation unnecessary was [sic] Grant's own desire to not have his family contacted and his twenty years of incarceration prior to this crime.

Even if counsel's failure to independently contact Grant's family fell below acceptable standards of conduct, his conduct did not result in prejudice in this case. There is no indication that had the jury been confronted with the testimony of family members the result of this proceeding would have been different. The jury found the existence of three aggravating circumstances. Grant was incarcerated for committing violent crimes. He violently and repeatedly stabbed a civilian kitchen worker while he was serving a sentence for a violent crime. The testimony of Grant's family members would not have swayed the jury from imposing the death penalty.

Grant II, 95 P.3d at 180-81 (citations and footnote omitted).[7]

F.    *New evidence submitted with Grant's habeas petition*

In support of his Ground 1 claim, Grant attaches new evidence to his Petition not previously submitted to the state court.  Dkt. # 12, Exs. E -K.  This evidence includes the Affidavit of George Rawlings, investigator, detailing an interview with James Bowen, Grant's trial counsel (Ex. E); the Affidavits of LuJean Johnson, Grant's aunt, and Teresa McMahill, mitigation expert, each detailing additional facts about Grant's childhood including allegations of neglect and physical and emotional abuse in his household (Exs. F and G); the Affidavit of Ricky Mitchell, Grant's childhood friend and an inmate with Grant at the Boley and Helena juvenile facilities and at Dick Conner Correctional Center (Ex. H); the Affidavit of Donna Schwartz-Watts, a psychiatrist, which details additional

---

[7]       Judge Chapel again filed a vigorous dissent with respect to Grant's ineffective assistance of counsel claim.  See Grant II, 95 P.3d at 184-190.

conditions that Grant suffers or suffered from at the time of the murder (Ex. I); and the affidavits of two jurors which state that if they had heard more information about Grant's background, they may have voted for a sentence less than death (Exs. J and K).  Respondent argues that such documents are not properly before this Court because they have not been presented to the OCCA.  Dkt. # 18 at 16. Grant argues that these documents are properly before the Court as added evidentiary support for Grant's ineffectiveness claim and that "nothing in these materials changes the fundamental character of the claim . . . ." Dkt. # 24 at 12.

First, the Court notes that it cannot consider the juror affidavits (see Dkt. # 12, Exs. J and K) submitted by Grant to show that the jurors would have voted differently had trial counsel presented additional evidence of Grant's troubled childhood.  See Capps v. Sullivan, 921 F.2d 260, 262 (10th Cir. 1990) (holding that evidence that jurors would have voted differently is inadmissible in federal habeas corpus proceedings); see also Fed.R.Civ.P. 606(b); Okla. Stat. tit.12, § 2606(b); cf. Tanner v. United States, 483 U.S. 107 (1987). Likewise this Court will not consider the affidavit of Investigator George Rawlings or the affidavit of mitigation expert Teresa McMahill as they are based upon hearsay and are otherwise unreliable.  See Neill v. Gibson, 278 F.3d 1044, 1056 (10th Cir. 2001) (holding district court did not abuse its discretion in disregarding inadmissible hearsay investigator affidavits presented to support habeas petition); see also Herrera v. Collins, 506 U.S. 390, 417  (1993) (noting that affidavits submitted in habeas action were "particularly suspect" because they were based on hearsay).  Investigator Rawlings's affidavit sets forth that he accompanied Lisa S. McCalmont, one of Grant's attorneys in these habeas proceedings, to an interview with trial counsel, James Bowen. See Dkt. # 12, Ex. E.  Rawlings's affidavit consists of the investigator's recounting of what was said by Mr. Bowen to Ms. McCalmont in that interview.

20

This "third hand" account of trial counsel's unsworn statements that are not subject to cross-examination are inherently unreliable and will not be considered in support of Grant's request for habeas relief.  Furthermore,  the substance of Ms. McMahill's affidavit derives from the social history which she prepared for Grant.  See Dkt. # 12, Ex. G. She affixes the social history to the affidavit as Exhibit 3.  The social history is based upon interviews with Grant's siblings who had already testified at the state court evidentiary hearing.  See id., ¶¶ 7, 10.  Much of the social history does not directly identify which family member relayed what information, making the affidavit and social history particularly unreliable.

Under the doctrine of exhaustion, a state prisoner must generally exhaust available state court remedies before filing a habeas corpus action in federal court. See  28 U.S.C. § 2254(b); Picard v. Connor, 404 U.S. 270, 275 (1971); Demarest v. Price,  130 F.3d 922, 932 (10th Cir. 1997). The exhaustion doctrine requires a state prisoner to "fairly present[ ]" his or her claims to the state courts before a federal court will examine them. Picard, 404 U.S. at 275.  "Fair presentation" of a prisoner's claim to the state courts means that the substance of the claim must be raised there. The prisoner's allegations and supporting evidence must offer the state courts "a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim." Anderson v. Harless, 459 U.S. 4, 6 (1982) (citing Picard, 404 U.S. at 276-77).

It is true that a habeas petitioner may present "bits of evidence" to a federal court that were not presented to the state court without converting the claim to a new one. See Hawkins v. Mullin, 291 F.3d 658, 670 (10th Cir. 2002) (quoting Demarest v. Price, 130 F.3d 922, 932 (10th Cir. 1997)); see also  Vasquez v. Hillery,  474 U.S. 254, 260  (1986) ("We hold merely that the supplemental evidence presented by respondent did not fundamentally alter the legal claim already considered by

the state courts, and, therefore, did not require that respondent be remitted to state court for consideration of that evidence."); Fairchild v. Workman, 579 F.3d 1134, 1148 (10th Cir. 2009) ("To be sure, not every new piece of evidence makes a claim a new one."). "[A]t a certain point, when new evidence so changes the legal landscape that the state court's prior analysis no longer addresses the substance of the petitioner's claim, [the Court] must necessarily say that the new evidence effectively makes a new claim-one that the state court has not adjudicated on the merits." Fairchild, 579 F.3d at 1149; see also Hawkins, 291 F.3d at 670 ("[A habeas petitioner] cannot first present evidence in a federal habeas proceeding that 'places the claims in a significantly different legal posture' without first presenting that evidence in state court.").

This Court need not determine whether the new evidence attached to Grant's Petition transforms Grant's claim into a new and unexhausted claim because, even considering the new evidence (excluding those affidavits discussed above which the Court cannot or will not consider on evidentiary grounds), Grant is not entitled to relief on his ineffective assistance of counsel claim. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

G. *Analysis*

1. Trial counsel's performance was deficient.

This Court agrees with Grant that his trial counsel's sentencing phase performance was constitutionally deficient. The OCCA found in its opinion on remand that "[c]ounsel's decision in this case was driven by Grant's own request to not have his family contacted."and "[c]ounsel's decision was directed by his client." See Grant II, 95 P.3d at 181.  The OCCA later mentioned again

that counsel's "decision" not to investigate was directed by his client. See id.  The OCCA's factual

determination that Grant's trial counsel made a decision not to investigate Grant's childhood or

family at Grant's direction is not supported by the record and in fact is flatly contradicted by it.[8]

Grant's trial counsel, James Bowen, specifically testified that he directed his  investigators to try to

locate members of Grant's family despite his client's misgivings regarding getting his family

involved.  Tr. Evid. at 55-56. Bowen stated that he would not have allowed his client's views about

his family or his concern that he might not be able to use them at trial to have limited his

investigation into the family.[9]   Tr. Evid. at 58, 63.  Bowen at no point attributed his failure to

contact Grant's family to Grant's wish that his family not be involved. Moreover, the record shows

that there was no "decision" by counsel not to contact Grant's family members.   In fact, the record

here suggests that rather than deciding not to pursue mitigating evidence about Grant's early life

from members of his family, Grant's counsel recognized that such information was relevant and

---

[8]     This Court makes this finding fully cognizant of the mandate of 28 U.S.C. § 2254(e)(1) that
"a determination of a factual issue made by a State court shall be presumed to be correct."
This Court finds that Grant has met the burden of rebutting the presumption of correctness
by clear and convincing evidence. See id.

[9]     Grant's counsel stated:

I know that I talked to Mr. Grant at length about his family. I could not, I can't sit
here and say that that was exactly the way I approached Mr. Grant and exactly the
question or exactly what I told him with regard to the importance of having his
family testify.  I can only say that we had a number of conversations about it and that
was not something that he was interested in pursuing, however, I don't normally, I
don't take that into consideration what the Defendant in a Capital murder case wants
with regard to those kinds of issue.  We would still follow-up as far as trying to find
family and getting information independently.

Tr. Evid. at 58.

potentially helpful – he just never accomplished the task of actually obtaining it. <u>See</u> Tr. Evid. at 55-56, 58 and 63.[10]

The record here reveals that Grant's trial counsel did almost nothing with regard to investigating Grant's childhood and social history.  Neither trial counsel nor either of the two investigators ever contacted or interviewed any member of Grant's family despite the fact that at least nine members of Grant's family were readily findable and willing to testify.  Instead, counsel relied exclusively on Grant for an understanding of his early life and childhood.

"In assessing [defense] counsel's investigation" of available mitigating evidence in a capital case, a federal habeas court "must conduct an objective review of [defense counsel's] performance, measured  for 'reasonableness under prevailing professional norms . . . .'" <u>Wiggins v. Smith</u>, 539 U.S. 510, 523 (2003) (quoting <u>Strickland</u>, 466 U.S. at 688). Those prevailing professional norms, according to the Supreme Court, include the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (ABA Guidelines). <u>Id.</u> at 524 (calling the ABA Guidelines "guides to determining what is reasonable."). Under the ABA Guidelines, "investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" <u>Id.</u> (quoting 1989 version of ABA Guidelines). Among the topics defense counsel should investigate and consider presenting include *family and social history*, prior adult and juvenile correctional experiences,  medical history, educational history, employment and training history, and religious and cultural influences. <u>Id.</u> (emphasis in original) (citing 1989 version of ABA Guidelines).

---

[10]     Likewise, to the extent that the OCCA's factual determination implies that Grant waived his right to present mitigating evidence it is unreasonable and contradicted by the record.  <u>See</u> <u>Grant II</u>, 95 P.3d at 186-87 (Chapel, J., dissenting).

The Supreme Court ruled in <u>Wiggins v. Smith</u> that defense counsels' "failure to investigate [defendant's] background and present mitigating evidence of his unfortunate life history" at his capital sentencing hearing constituted ineffective assistance of counsel. 539 U.S. at 514, 538. Defendant Kevin Wiggins was convicted of the murder of a 77-year-old woman, but, at his subsequent capital sentencing hearing, counsel proffered no evidence of Wiggins' life history or family background. <u>Id.</u> at 526. In fact, Wiggins had suffered numerous incidents of severe physical and sexual abuse as a child from his mother and while in the care of a series of foster parents. <u>Id.</u> at 525. Wiggins' alcoholic mother would leave him and his siblings alone for days without food, forcing them to beg for food and to eat paint chips and garbage. <u>Id.</u> at 516-17, 525. The Court determined that counsels' failure to discuss these incidents resulted not from any strategic judgment, but rather from counsels' "inattention," and found accordingly counsels' ineffectiveness. <u>Id.</u> at 526.

The fact that counsel was aware of some of this background information, the Court concluded, did not establish that counsels' failure to put this information before the jury was due to some sort of tactical choice. <u>Id.</u> at 527.  Indeed, the Court explained:

> In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming [defense counsel] limited the scope of their investigation for strategic reasons, <u>Strickland</u> does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy.

<u>Id.</u> The Court concluded, in light of the extensive information that counsel could have found about Wiggins' background but failed to even try to produce, "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy

25

impossible." Id. at 527.  As a result, counsels' performance was deficient and, the Court added, it was prejudicial as well:

> Given both the nature and the extent of the abuse petitioner suffered, we find there to be a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing in an admissible form. . . . We further find that had the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence. . . . Wiggins' sentencing jury heard only one significant mitigating factor—that Wiggins had no prior convictions. Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance.

Id. at 536-37.

Numerous decisions rest upon the principle that defense counsel renders deficient performance where he or she fails to adequately investigate the defendant's background including contacting and interviewing family members. See Battenfield v. Gibson,  236 F.3d 1215, 1228-29 (10th Cir. 2001) (citing Clayton v. Gibson, 199 F.3d 1162, 1178 (10th Cir. 1999) (assuming, without deciding, that defense counsel "rendered deficient assistance by not contacting family members during the course of conducting a second stage investigation"); Baxter v. Thomas, 45 F.3d 1501, 1513 (11th Cir. 1995) (concluding that reasonable investigation would have included interviews with defendant's sister and neighbor, as well as defendant's mother and brother); Stafford v. Saffle, 34 F.3d 1557, 1563 (10th Cir. 1994) (concluding that counsel's penalty-phase performance was deficient where counsel explored defendant's "background to some degree," but "conducted no specific investigation for mitigation evidence"); Blanco v. Singletary, 943 F.2d 1477, 1501-02 (11th Cir. 1991) (concluding defense counsel was ineffective for failing to contact defendant's relatives and acquaintances prior to trial); Harris v. Dugger, 874 F.2d 756, 763 (11th Cir. 1989) (concluding defense counsel's performance was deficient where "neither lawyer ... investigated [the defendant's]

26

background, leading to their total-and admitted-ignorance about the type of mitigation evidence available to them")).

Counsel's failure to contact Grant's family clearly falls short of the professional norms at the time set forth in the 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases referenced by the Supreme Court in <u>Wiggins</u>. 539 U.S. at 524.  Furthermore, the record here suggests that rather than deciding not to pursue mitigating evidence about Grant's early life from members of his family, Grant's counsel just never accomplished the task of actually obtaining it despite the fact that the evidence was readily available.  Thus, in this case, much like in <u>Wiggins</u>, counsel's failure to present mitigating evidence of Grant's childhood resulted from "inattention, not reasoned strategic judgment." <u>Wiggins</u>, 539 U.S. at 526.  Counsel was "not in a position to make a reasonable strategic choice" about the presentation of family testimony in Grant's case. <u>Id.</u> As the <u>Wiggins</u> Court noted in regard to trial counsel in that case, the claim that Grant's counsel made a strategic decision not to diligently pursue mitigating family evidence "resembles more a post-hoc rationalization of counsel's conduct than an accurate description of [his] deliberations prior to sentencing." <u>Id.</u> at 526-27.

Furthermore, even actual strategic decisions by counsel are always subject to evaluation for their "reasonableness"; and given the circumstances of Grant's case, a decision not to diligently pursue family and life history evidence in his case simply could not be evaluated as "reasonable." Grant was serving a total of 130 years for armed-robberies at the time he killed Gay Carter.  This provided strong evidence for the aggravating factors involving past criminal history and current incarceration making the need for mitigating evidence in his case especially critical.  Furthermore, there is no indication in the record that trial counsel found any evidence during his minimal

investigation that would suggest that further investigation into Grant's childhood would be unnecessary or unhelpful. "Hence defense counsel's 'choice' to not fully pursue the strategy of at least discovering what Grant's childhood and early life were like simply cannot be cloaked in the mantra of a 'reasonable strategic decision.'" Grant II, 95 P.3d at 188 (Chapel, J., dissenting).  The fact that members of Grant's family might have had a hard time claiming that they had remained "close" to Grant through the years, does not change the fact that these individuals possessed important evidence about the difficulties and deprivation of Grant's early years. See Austin v. Bell, 126 F.3d 843, 849 (6th Cir.1997) (concluding that counsel's failure to investigate and present mitigating evidence at the penalty phase of the trial, on grounds that counsel "did not think it would do any good," constituted ineffective assistance).  As in Wiggins, counsel's failure to first adequately investigate and uncover this evidence made his "decision" not to present this (undiscovered) evidence during Grant's trial even less deserving of deference as a "reasonable strategic decision." Wiggins, 539 U.S. at 528.[11]

---

[11]     Furthermore, the fact that counsel was aware of some of Grant's background information, and the fact that Grant actually did provide limited testimony about his childhood did not establish that counsels' failure to put this information before the jury was due to some sort of tactical choice. See Wiggins, 539 U.S. at 527.  Grant's testimony at trial consisting basically of the number of siblings he had and the fact that he began getting in trouble and was institutionalized as an adolescent hardly qualifies as mitigating evidence compared to the very sympathetic facts about Grant's earliest years of life shared by his family at the evidentiary hearing in state court.

        Finally, even had counsel made an actual strategic decision to forgo investigation at Grant's direction, that decision would not have been reasonable.  It is well established that the weight to be given a client's wishes either to put on evidence or to refrain from putting on evidence will depend on how well informed the client is and on the adequacy of the lawyer's advice to the client in this regard, all of which is dependent on an adequate investigation by counsel. See Battenfield, 236 F.3d at 1232 (counsel's failure to investigate clearly affected his ability to competently advise the petitioner regarding the meaning of mitigation evidence and the availability of possible mitigation strategies and as a result, the petitioner's waiver

Counsel's investigation into Grant's childhood did not reflect reasonable professional judgment. Counsel's purported "decision" to end investigation without contacting Grant's family members was neither consistent with the professional standards that prevailed in 1989, nor reasonable in light of the circumstances. Grant's counsel's sentencing phase performance was constitutionally deficient. Nonetheless, as discussed below, Grant has failed to establish that there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different.

> 2.      Grant has not shown that his trial counsel's deficient performance prejudiced his defense.

In order for counsel's deficient performance to constitute a Sixth Amendment violation, Grant must show that counsel's failures prejudiced his defense. Strickland, 466 U.S. at 692. In order to make a threshold showing of actual prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 694. A reasonable probability is one sufficient to undermine confidence in the outcome. Id. The Court in Strickland also stated that "it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceedings." Id. at 688. Failure to make the requisite showing under either prong of the Strickland test defeats the ineffectiveness

---

of his right to present mitigating evidence was not knowing and voluntary); see also Hardwick v. Crosby, 320 F.3d 1127, 1189-90 (11th Cir. 2003) ("[T]his court has held that a defendant's desires not to present mitigating evidence do not terminate counsels' responsibilities during the sentencing phase of a death penalty trial: '. . . . the lawyer first must evaluate potential avenues and advise the client of those offering potential merit.'"). Thus, in this case, Grant could not have made an informed decision to forgo presentation of mitigating evidence regarding his childhood due to trial counsel's failure to conduct an adequate investigation.

claim. Id. at 700. The Tenth Circuit has addressed the second prong of Strickland, holding that "when a petitioner is challenging the imposition of the death sentence during the punishment phase of the trial, the prejudice prong of Strickland focuses on whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Hale v. Gibson, 227 F.3d 1298, 1314 (10th Cir. 2000) (internal quotation marks omitted). In assessing prejudice, this Court must keep in mind the "strength of the government's case and the aggravating factors the jury found as well as the mitigating factors that might have been presented . . . ." Id. at 1316 (citing Stafford v. Saffle, 34 F.3d 1557, 1564 (10th Cir. 1994)).

After remand from the Supreme Court, the OCCA determined that "[t]here is no indication that had the jury been confronted with the testimony of family members the result of this proceeding would have been different." Grant II, 95 P.3d at 181.

As discussed above, Grant's family members would have testified regarding positive qualities Grant possessed and plead for his life.  They would also have testified regarding the poverty in which Grant was raised, that he was raised primarily by his older sisters, that he was a sensitive child that did not get as much attention as he may have needed, that he was essentially abandoned by his father, and that he turned to a life of crime before he was even a teenager at least in part to help his family meet their basic needs.  Grant also submits new evidence in the form of affidavits to support his ineffective assistance of counsel claim.  The information pertaining to Grant's childhood found in the Affidavit of LuJean Johnson (Dkt. # 12, Ex. F), Grant's aunt, was primarily cumulative of the testimony of Grant's other family members presented at the evidentiary hearing in state court.  The Affidavit of Ricky Mitchell (Dkt. # 12, Ex. H), Grant's childhood friend

and an inmate with Grant at the Boley and Helena facilities and at Dick Conner Correctional Center,

described the abusive conditions at the Boley and Helena schools generally but did not specifically

describe abuse suffered by John Grant. Mitchell described Grant as a non-violent person, stated that

Grant "lost his family when he went to prison," and described Grant's friendship with the victim.

See id.    The Affidavit of Donna Schwartz-Watts, a psychiatrist, states that the

psychiatric/psychological evaluation at the time of his trial was flawed because the defense expert

had an inadequate developmental or family history. Dkt. # 12, Ex. I.[12]  Dr. Schwartz-Watts states

that it is her opinion that Grant "suffers from mental illness (Reactive Attachment Disorder, Major

Depression, and Post Traumatic Stress Disorder) and personality disorders (Mixed, with Paranoid

and Antisocial features) that affected his conduct at the time of the offense for which he was

convicted."  Id.[13]

The testimony by the family members regarding their love for Grant and pleas for mercy

were hardly compelling in light of the fact that the family rarely if ever visited him in prison and did

not maintain regular contact with him during his twenty years in prison prior to murdering Ms.

Carter. The family's testimony regarding Grant's difficult childhood was certainly sympathetic, but

---

[12]    Respondent argues that the Court should not consider Dr. Schwartz-Watts' affidavit because its substance is nearly identical to the information in Grant's post-conviction application on the effects of long term incarceration which the OCCA rejected.  See Dkt. # 18 at 17. Respondent is incorrect. Dr. Schwartz-Watts' affidavit does not address the effects of long-term incarceration on Grant.

[13]    Dr. Schwartz-Watts' statements in her affidavit regarding assaults suffered by Grant while in DOC custody and regarding physical ailments suffered by Grant at the time of the murder are not relevant to Grant's ground one claim. See Dkt. # 12 at 10 (Petitioner's title to his ground one claim reads as follows: "Trial counsel's failure to investigate and present readily available evidence in mitigation about neglect and abuse suffered by Mr. Grant as a child denied Mr. Grant effective assistance of counsel in violation of the Sixth, Eighth, and Fourteenth Amendments.").

the twenty years that had passed since Grant was imprisoned and left that childhood behind would lessen the impact of that testimony on the jury. Grant's family could not testify regarding the man that Grant became during his incarceration or explain what might have caused Grant to commit murder after being imprisoned for approximately twenty years.

The State presented a strong case for the death penalty. Most compellingly, Grant was serving a total of one-hundred thirty (130) years for four separate armed robberies and had been in prison for about twenty years when he "savagely and repeatedly stabbed Gay Carter" on November 13, 1998. Grant I, 58 P.3d at 789.

The jury found the existence of three aggravating circumstances: (1) Grant had theretofore been convicted of felonies involving the use or threat of violence to the person; (2) the murder was committed while Grant was serving a sentence of imprisonment on a conviction for a felony; and, (3) there exists a probability that Grant will commit criminal acts of violence that would constitute a continuing threat to society. The evidence in support of Grant's criminal history of offenses "involving the use or threat of violence to the person" included judgments and sentences for three armed robberies. Grant and the victim had an altercation on the day before the murder in which Grant told the victim something similar to "I'll get you, bitch" during the serving of breakfast. Tr. Vol. V at 1145. On the day of the murder Grant and the victim had a second altercation, during the serving of breakfast, in which Grant told the victim "you're mine." Tr. Vol. V at 1206. After breakfast, Grant was seen in the dining hall while the inmate crew was cleaning up. Tr. Vol. V at 1148, 1163, 1207, 1209, 1211. Grant was seen grabbing the victim and dragging her into the mop closet. Tr. Vol. V at 1213, 1217. Grant repeatedly stabbed the victim in the chest. Tr. V, 1150-51,

1178, 1216, 1225. Grant was observed leaving the mop closet, after the attack on the victim, carrying a weapon. Tr. Vol. V at 1152,1249-50.

This case is distinguishable from Wiggins in which the Supreme Court found that counsel's failure to discover and present Wiggins' "excruciating life history" constituted ineffective assistance of counsel warranting habeas relief. 539 U.S. at 537.  The mitigating evidence that counsel failed to discover in this case is not as powerful as that in Wiggins. Cf. id. at 534-35.  Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. Id. at 535.  He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. The time Wiggins spent homeless, along with his diminished mental capacities, further augmented his mitigation case.  See id. In contrast, the mitigating evidence which counsel here failed to discover and present shows that Grant grew up dirt poor, was raised primarily by his older siblings, didn't get as much attention as he may have needed, was abandoned by his father, and turned to a life of crime early to help provide for his family. Evidence submitted with Grant's habeas petition suggests that Grant may have been physically abused as an adolescent in the juvenile facilities.  See Dkt. # 12, Ex. H.  The undiscovered evidence in Grant's case was simply not as compellingly mitigating as the undiscovered evidence in Wiggins. Moreover, Wiggins had no prior criminal history, while Grant was incarcerated for multiple prior armed robberies at the time he killed Gay Carter.  Cf. id. at 537.  Additionally, Grant killed Ms. Carter after being incarcerated for approximately twenty years. This fact provides overwhelming support for the continuing threat aggravator that cannot be negated by the undiscovered mitigating evidence.  The mitigating evidence in this case is weaker and the State's evidence of aggravating circumstances in support of the death penalty is stronger than that discussed in Wiggins.

33

The Tenth Circuit has held, in a number of cases, that "evidence of a troubled childhood involving physical, emotional, sexual and/or substance abuse does not outweigh evidence supporting the conviction and evidence supporting multiple aggravating circumstances." Walker v. Gibson, 228 F.3d 1217, 1234 (10th Cir. 2000) (quoting Foster v. Ward, 182 F.3d 1177, 1189 (10th Cir. 1999) (collecting cases)), abrogated on other grounds by Neil v. Gibson, 278 F.3d 1044 (10th Cir. 2001). Moreover, the evidence of Grant's mental illness and troubled upbringing presents a "double-edged" sword because while it is mitigating evidence, it could also further support the State's claim that he represented a continuing threat to society. See Wackerly v. Workman, 580 F.3d 1171, 1180 (10th Cir. 2009), cert. denied 130 S.Ct. 3387, 177 L.Ed.2d 308  (2010) (finding no prejudice from counsel's failure to present evidence that petitioner suffers from certain psychological maladies because "it is the type of 'double-edged' evidence that could have as easily hurt as helped his cause"); see also, e.g., McCracken v. Gibson, 268 F.3d 970, 979-80 (10th Cir. 2001) (stating that information outlining defendant's multiple psychological problems could have been viewed by jury as additional evidence that defendant represented a continuing threat to society); Cannon v. Gibson, 259 F.3d 1253, 1277-78 (10th Cir. 2001) (explaining that development of evidence regarding defendant's social history and brain damage at sentencing phase may have depicted the defendant as an unstable individual with very little impulse control and could have strengthened the State's argument that the defendant represented a continuing threat to society, and thus had the possibility of being a two-edged sword); Foster, 182 F.3d at 1189 ("We have on numerous occasions determined that evidence of a troubled childhood involving physical, emotional, sexual and/or substance abuse does not outweigh evidence supporting the conviction and evidence supporting multiple aggravating circumstances; nor does evidence of low I.Q. and/or organic brain damage.");

34

Newsted v. Gibson, 158 F.3d 1085, 1100 (10th Cir. 1998) (Court stated, where powerful aggravating evidence of the defendant's series of increasingly violent crimes, culminating in murder, had been presented, that "[a]lthough grievous, [the defendant's] life history does not automatically mitigate the aggravating circumstances that the jury found present here."). The aggravating circumstances would not have been rebutted by testimony from family members regarding Grant's impoverished and troubled childhood, their love for Petitioner and pleas for mercy. See also Nguyen v. Reynolds, 131 F.3d 1340, 1349 (10th Cir. 1997) (even if evidence had been presented, it would have been insufficient to offset, explain, or justify murders).

In light of the powerful and overwhelming evidence in support of the three aggravating circumstances, there is no reasonable probability that the jury would have returned with a different verdict if the proffered family testimony had been presented. Wiggins, 539 U.S. at 535; Strickland, 466 U.S. at 694. Certainly, it appears that Grant had a bad childhood, but, as succinctly put by Judge Lumpkin of the OCCA in his concurrence in Grant's direct appeal, "[t]wenty years of structured incarceration has not been sufficient to ameliorate the defendant's violent tendencies and that is what impacts the average juror as they view the savagery of this attack on an unarmed female food service worker." Grant II, 95 P.3d at 184 (Lumpkin, J., concurring specially). This simply is not a case where unproduced mitigating evidence is of such a kind and quantity as to call into question the outcome of Grant's penalty phase proceedings. The case against Grant was strong and the evidence Grant faults trial counsel for failing to present is remote in time and bears a distinctly double-edged quality. Grant has failed to establish that the OCCA's determination that he did not establish that he was prejudiced by counsel's deficiencies was contrary to or an unreasonable application of

Strickland or Wiggins. 28 U.S.C. § 2254(d).  Grant is not entitled to habeas corpus relief on his ground one claim.

**II.       Failure to Excuse Venireperson for Cause (Ground 2)**

In his second ground for habeas relief, Grant contends that the trial court's rulings during voir dire denied him an impartial jury in violation of the Sixth, Eighth and Fourteenth Amendments. First, he claims that prospective jurors Gee and Martin should have been excused for cause. Grant argues that because he was forced to use a peremptory challenges to remove prospective jurors Gee and Martin, he was unable to remove Juror Hardgrave, "a juror who appeared irrevocably committed to a sentence of death as punishment for any first degree murder." See Dkt. # 12 at 58; Dkt. # 39 at 3.  Grant also argues in his supplement to his petition that the OCCA failed to give him the same relief for that violation of state law that it gave other similarly situated defendants in violation of his constitutional rights.  See Dkt. # 39 at 2.  Upon review of the merits, the OCCA rejected these claims on direct appeal and in Grant's second post-conviction application. Respondent asserts that Grant has failed to establish that the OCCA's determination was contrary to, or an unreasonable application of, Supreme Court law. See Dkt. # 18 at 21, 25.

The OCCA found that Grant "has not shown that he was forced, over objection, to keep an unacceptable juror" and "fail[ed] in the burden to show that the jury was biased." Grant I, 58 P.3d at 791.  Additionally, after the OCCA's decision in Jones v. State, 134 P.3d 150, 155 n.14 (Okla. Crim. App. 2002) reversing  in part its decision in Grant I, Grant filed a second application for post-conviction relief arguing that the state court's recent decision in Jones showed that Grant has been treated differently than other similarly situated defendants in violation of his Fifth, Eighth and Fourteenth Amendment rights.  See Second Application for Post-Conviction Relief, No. PCD-2006-

690, at 9. The OCCA again denied the claim finding that Grant did not show that he was forced to keep an "unacceptable juror" and ruled that "[o]ur previous finding that Grant did not show that he was forced, over objection, to keep and [sic] unacceptable juror is *res judicata*." See Order Denying Second Application for Post-Conviction Relief (Nov. 6, 2006), No. PCD-2006-690, at 3.

Under the Sixth Amendment to the Constitution, a defendant has a right to trial by an impartial jury. "One touchstone of a fair trial is an impartial trier of fact- 'a jury capable and willing to decide the case solely on the evidence before it.'" McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984) (quoting Smith v. Phillips, 455 U.S. 209, 217 (1982)). The proper standard for determining when a prospective juror should be excused for cause based upon his views about capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424 (1985) (quoting Adams v. Texas, 448 U.S. 38 (1980)). The OCCA relied on Ross v. Oklahoma, 487 U.S. 81 (1988) (and on Abshier v. State, 28 P.3d 579, 603-04 (Okla. Crim. App. 2002) which relies upon Ross). In Ross, the Supreme Court noted, "Petitioner was undoubtedly required to exercise a peremptory challenge to cure the trial court's error. But we reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. We have long recognized that peremptory challenges are not of constitutional dimension." Id.  The Ross court reiterated the standard set forth in Wainwright, and concluded that any claim that Ross' jury was not impartial must focus on the jurors who ultimately sat, and not the juror who was excused through a peremptory challenge because the judge would not excuse him. Id. at 85-86; see also United States v. Martinez-Salazar, 528 U.S. 304, 305 (2000) (citing Ross and

noting that "[s]o long as the jury that sits is impartial, . . .  the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated").[14]

A.      *Juror Hardgrave*

A review of the transcript reveals that Juror Hardgrave was not "a juror who appeared irrevocably committed to a sentence of death as punishment for any first degree murder." Ms. Hardgrave was initially questioned by the trial court:

> Q:      . . . . If you find the defendant guilty of Murder in the First Degree, can you and will you consider all three possible punishments and impose the one punishment warranted by the law and the evidence?
>
> A:      Yes.
>
> Q:      If you find the defendant guilty of Murder in the First Degree would you automatically impose the death penalty without considering the penalties of life and life without parole?
>
> A:      Well, are we instructed to? I mean those are the three choices.
>
> Q:      Yes.
>
> A:      Oh, no.
>
> Q:      You wouldn't automatically just say death period?
>
> A:      No.
>
> . . . .
>
> Q:      . . . . [I]f the law and the facts and the evidence warrant, could you impose the life penalty?
>
> A:      Yes.

---

[14]      In accordance with the Supreme Court's decision in <u>Ross</u>, this Court need not analyze whether the trial court improperly failed to excuse potential jurors Gee and Martin for cause, as it finds that the OCCA's conclusion that Juror Hardgrave was not unacceptable to be reasonable. 487 U.S. at 85-86.

> Q:     And if warranted and the law and the facts and evidence said so, could you impose life without parole?
>
> A:     Yes.

Tr. Vol. II at 525-26.  The prosecutor then questioned Juror Hardgrave further and she reiterated that she would consider all three punishments. Id. at 528-29.  Ms. Hardgrave was then questioned by defense counsel and the following exchange took place:

> Q:     . . . . Now, knowing that, knowing that First Degree Murder is a crime where somebody decides intentionally to kill another person and then kills them for no reason, no good reason, do you think a person deserves the death penalty for that?
>
> A:     Yes.
>
> Q:     Would you automatically impose the death penalty if you found that a person intentionally decided to kill another person for no reason or for a bad reason?
>
> A:     Yes.
>
> . . . .
>
> Q:     If I understand what you're saying then you believe that if someone intentionally kills another person for no reason then you - - would you believe without hearing anything else that the appropriate punishment would be the death penalty and that's what you would give them?
>
> A:     Yes.

Id. at 530-31.  Defense counsel then challenged Ms. Hargrave for cause and the prosecutor received permission to re-inquire. Id. at 531. The prosecutor questioned Ms. Hargrave further at which time she stated, "I wouldn't say that I would automatically give the penalty.  I would just have to hear everything. I mean I could if it was just - - I don't know how to answer it." Id. at 531-32.  At that point, the trial court conducted additional voir dire of Ms. Hardgrave to attempt to alleviate any confusion. The following exchange between the trial court and Ms. Hardgrave took place:

> Q:    To be guilty of First Degree Murder there's an element of intent.  When you make that finding of guilt, you're going to find that he intentionally killed somebody.
>
> A:    Okay.
>
> Q:    Now, you get that one behind you.  Now you come to the second stage and you [have] got three options as to punishment.  Now, you're telling these two fellows two diametrically opposed things.  We are not sure, I am not sure and let me preface what I am about to say that there are no wrong answers here.
>
> A:    Uh-huh.
>
> Q:    We're just trying to figure out how you feel about these things.  Given those three options after you already decided that he's intentionally killed somebody would you consider all three or would you say because he intentionally killed this person he gets the death penalty?
>
> A:    Oh, I wouldn't automatically say he gets the death penalty.  I thought you mean if, well, I was confused.  I mean I would have to hear the facts, yes.  But I would consider all three.  I am sorry.

Id. at 533-34.  Defense counsel then questioned Ms. Hardgrave further at which time she maintained that she would not automatically give the death penalty and that she could consider all three punishments.  Id. at 536-37.  Defense counsel re-urged his motion to dismiss Ms. Hardgrave for cause and the trial court denied that motion.  Id. at 538.

Defense counsel proceeded to exhaust his remaining three peremptory challenges on potential jurors other than Ms. Hardgrave.  At the close of voir dire, defense counsel then asked the trial court to grant additional peremptory challenges and stated that, if granted further peremptory challenges, he would remove Juror Hargrave. Tr. Vol. IV at 961-62. Grant argues that the trial court's failure to excuse potential jurors Gee and Martin for cause resulted in him being forced to retain an unacceptable juror, Juror Hardgrave.

The OCCA found that Grant "fail[ed] in the burden to show that the jury was biased" and that he failed to show he had been forced to keep an unacceptable juror. Grant I, 58 P.3d at 791. This Court agrees that Grant has failed to demonstrate how Juror Hardgrave was not impartial. A complete review of Juror Hargrave's voir dire answers reveals the error in Grant's assertion that Juror Hardgrave "appeared irrevocably committed to a sentence of death as punishment for any first degree murder." See Dkt. #12 at 58. Juror Hardgrave stated that she would consider all three possible punishments and would look at the evidence before deciding the appropriate punishment. Grant makes no other argument supporting his claim that Juror Hardgrave was an "unacceptable juror."

B.    Analysis

The OCCA's reliance on Ross is both reasonable and correct. Juror Hardgrave specifically stated that she would consider all three sentencing options. Thus, the trial court did not violate Grant's constitutional rights in denying defense counsel's motion to excuse Ms. Hargrave for cause. See Sallahdin v. Gibson, 275 F.3d 1211, 1224 (10th Cir. 2002). The Court agrees with the OCCA that no violation of Grant's right to an impartial jury occurred at his trial.

However, Grant's primary argument is not that Juror Hargrave was biased but that the OCCA failed to give him the same relief for a violation of state law that they gave other similarly situated defendants in violation of his constitutional rights. Grant also argues that the OCCA's decision in Jones v. State, 134 P.3d 130 (Okla. Crim. App. 2006), overruling part of the language in Grant I, shows that Grant was treated differently than other similarly situated defendants in violation of his equal protections rights, due process rights, and his fair sentencing rights as protected by the Eighth

Amendment to the United States Constitution.[15]   The Supreme Court "has consistently held that there is no freestanding constitutional right to peremptory challenges." Rivera v. Illinois, --- U.S. ----, 129 S.Ct. 1446, 1453, 173 L.Ed.2d 320 (2009).   The Supreme Court has characterized peremptory challenges as "a creature of statute." Ross, 487 U.S. at 89.   "Because peremptory challenges are within the States' province to grant or withhold, the mistaken denial of a state-provided peremptory challenge does not, without more, violate the Federal Constitution. '[A] mere error of state law . . . is not a denial of due process.'" Rivera, 129 S.Ct. at 1453 (quoting Engle v. Isaac, 456 U.S. 107, 121 n.21 (1982) (internal quotation marks omitted).   However, Grant contends that a due process violation occurs "if the defendant does not receive that which state law provides" – e.g. where one is deprived of the state law created "right" to peremptory challenges.   See Dkt. # 39 at 16 (citing Ross, 487 U.S. at 88).

Grant argues that under Oklahoma law he was not required to show that Juror Hardgrave was "biased" – he need only show that she was "unacceptable."   Under Oklahoma law, in order to receive relief based on an improper denial of a challenge for cause, a defendant must show that due to the trial court's erroneous denial of a challenge for cause, he was forced to keep an unacceptable juror. Jones, 134 P.3d at 155. However, in Grant's second post-conviction, the OCCA explained that Jones

---

[15]   Respondent urges the Court to find that Grant's claim is procedurally barred because the OCCA in Grant's second post-conviction stated, "[o]ur previous finding that Grant did not show that he was forced, over objection, to keep and [sic] unacceptable juror is *res judicata*." See Order Denying Second Application for Post-Conviction Relief (Nov. 6, 2006), No. PCD-2006-690, at 3.   The Court disagrees.   As stated in Brecheen v. Reynolds, 41 F.3d 1343 (10th Cir. 1994), "if a state court addresses the merits of a particular federal claim on direct appeal, as it did here with respect to Mr. Brecheen's Eighth Amendment claim, then its subsequent refusal to grant 'further' state review in an application for postconviction relief should be given no effect and does not constitute a procedural bar for purposes of federal habeas corpus review." Id. at 1358 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803-04 & n.3 (1991)).   Thus, the Court is free to examine the merits of Grant's claim.

only overruled <u>Grant I</u> to the extent that it stood for the proposition that under Oklahoma law, an appellant must show that the jury panel was biased against him.  The OCCA went on to explain that its ruling in <u>Grant I</u> that Grant did not show that he was forced, over objection, to keep an unacceptable juror was consistent with <u>Jones</u>. <u>See</u> Order Denying Second Application for Post-Conviction Relief (Nov. 6, 2006), No. PCD-2006-690, at 3.

This Court need not consider Grant's contention that a due process violation might occur when one has been deprived of the state law-created right to a full complement of peremptory challenges, because Grant has "receive[d] that which state law provides." <u>See</u> <u>Ross</u>, 487 U.S. at 88. The Court finds that the state appellate court's determination that Grant did not show that Juror Hardgrave was "unacceptable" was not contrary to, or an unreasonable application of, Supreme Court law, or an unreasonable determination of the facts. <u>See</u> 28 U.S.C. § 2254(d). As discussed above, Juror Hardgrave repeatedly stated that she would consider all three punishments. Grant asserted no other arguments other than that Juror Hardgrave  "appeared irrevocably committed to a sentence of death as punishment for any first degree murder." <u>See</u> Dkt. #12 at 58. Because the OCCA appropriately determined that Juror Hardgrave was not "unacceptable," Grant was not deprived of that which state law provides and was not treated differently than other similarly-situated persons. For these reasons, Grant's due process and equal protection claims fail.

 Grant has not shown any violation of a federal constitutional right.  Habeas relief shall be denied on this issue.

## III.    Use of "Human Shackle" Restraints (Ground 3)

As his third proposition of error, Grant alleges that the manner in which he was escorted in and out of the courtroom by DOC officers who flanked him on either side, locked arm-in-arm with

him, violated his right to a fair trial.  Grant characterizes the DOC's officers method of transporting

him as utilizing a "human shackle" and argues that the method was akin to transporting him in

handcuffs or shackles in the view of the jury.  See Dkt. # 12 at 53.

There is no dispute that the prospective jury panel witnessed Grant being escorted from the

courtroom locked arm in arm with the prison guards. Tr. Vol. II at 437-39.  Grant I, 58 P.3d at 792.

Trial counsel promptly objected and moved for a mistrial. Id.  The trial court denied a mistrial and

stated that Grant has not been prejudiced because the trial court had already informed the jurors that

the DOC officers were there because Grant was in prison when this "alleged" crime took place and

that he would instruct the jury again that the presumption of innocence still applied to him. Id. at 439-

40.  The trial court asked the guards to refrain from locking arms with Grant going forward. Id.

Grant raised this claim on direct appeal where it was rejected by the OCCA as follows:

> We find that the method of escorting Grant to and from the courtroom did not
> violate Section 15 of Title 22, nor did it undermine the presumption of innocence. The
> human restraint was not the equivalent of using chains, handcuffs or shackles. Grant
> was not restrained during trial, and the human restraint was limited to the time he was
> being escorted to and from the courtroom. There is no error here.

Grant I,  58 P.3d at 793.

Grant has not identified any Supreme Court precedent expressly extending the general

prohibition on restraining a criminal defendant with visible shackles during a jury trial to the factual

situation presented here – where a defendant who is already in DOC custody for other crimes is

escorted to and from the courtroom during a jury trial locked arm-in-arm with armed guards. As a

result, this Court cannot find that the OCCA's adjudication of this claim was contrary to, or an

unreasonable application of, clearly established federal law as determined by the Supreme Court of

the United States.  For this reason alone, habeas relief must be denied on this issue. See House v.

44

Hatch, 527 F.3d 1010, 1017 (10th Cir. 2008) ("[T]he threshold determination that there is no clearly established federal law is analytically dispositive in the § 2254(d)(1) analysis.").

Moreover, Grant relies for his claim on Deck v. Missouri, 544 U.S. 622 (2005). See Dkt. # 12 at 71.  In Deck, the petitioner challenged his placement in leg irons, handcuffs, and a belly chain during the penalty phase of his capital trial on due process grounds. 544 U.S. at 625. The Supreme Court held that the Constitution forbids the use of visible shackles during the penalty phase, as well as the guilt phase of a defendant's trial. In the Deck case, decided after Grant's conviction became final, the Supreme Court held that "courts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding."  Id. at 633. Although "a criminal defendant has a right to remain free of physical restraints that are visible to the jury," the right is not absolute and "may be overcome in a particular instance by essential state interests such as physical security, escape prevention, or courtroom decorum." Id. at 628. Judges may exercise their discretion if special circumstances warrant the use of restraints during a trial. Id. at 633. The Supreme Court recognized that absent those special circumstances the use of shackling or physical restraints visible to the jury during either the guilt phase or the sentencing phase may result in a due process violation. Id. at 630, 632-33.  Finally, the Supreme Court held that "where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation." Id. at 635. Prior to Deck, the Supreme Court had suggested in dicta that shackling may, in some instances, run afoul of due process, but the Court did not expressly so hold until Deck.  See id. at 626-29 (stating that "[t]he law has long forbidden routine use of visible shackles during the guilt phase; it permits the State to shackle a criminal defendant only in the presence of a special need," and noting that it

45

had, in the past, "suggested that a version of this rule forms part of the Fifth and Fourteenth Amendments' due process guarantee.") (discussing <u>Allen</u>, 397 U.S. at 344; <u>Estelle v. Williams</u>, 452 U.S. 501, 503-504 (1976); <u>Holbrook v. Flynn</u>, 475 U.S. 560, 568 (1986)).

Because <u>Deck</u> was decided after Grant's conviction became final, it cannot be the basis of habeas relief for petitioner, as it was not clearly established federal law at the time the state court rendered its decision in his case. <u>See</u> <u>Wiggins v. Smith</u>, 539 U.S. 510, 520 (2003) (noting that, on habeas review, the court must look to the law that was clearly established at the time of the state court's decision); <u>Williams v. Taylor</u>, 529 U.S. 362, 390 (2000) (stating that review under AEDPA looks to law that was clearly established at the time the petitioner's state court conviction became final).   Accordingly, the OCCA decision that the human restraint used on Grant was not the equivalent of using chains, handcuffs or shackles and that there was no error was not contrary to or an unreasonable application of any clearly established federal law existing at the time of his conviction or state court review. However, even if this Court were to find that the pre-<u>Deck</u> cases clearly established that shackling may violate a defendant's due process rights, the method of transporting Grant that occurred in this case did not violate the Constitution.

In this case, according to the OCCA's factual finding and the trial record, Grant was escorted in and out of the courtroom by DOC officers who flanked him on either side, locked arm-in-arm with him in the view of the prospective jury panel.  He was never actually handcuffed or shackled.  Grant has cited no authority supporting his contention that human restraint is equivalent to handcuffs or shackles.  Moreover, he was not restrained during the trial in any manner, so the trial court had no discretionary decision to make concerning the restraints. The event occurred outside the trial as part of a routine security measure employed by law enforcement when transporting a defendant from one

46

location to another. See Earhart v. Konteh,  589 F.3d 337, 349 n.4 (6th Cir. 2009) ("The fact that

several jurors saw Mendoza in shackles as officers transported him to the courtroom was irrelevant

because restraining a defendant in the courtroom, and restraining him during transport there, are two

very different things. Reasonable jurors expect deputies to restrain all defendants in transport so that

the sight of a shackled Mendoza in this context could cause no prejudice.") (citations and quotations

omitted); United States v. Waldon, 206 F.3d 597, 608 (6th Cir. 2000). In this respect, the OCCA's

decision was not contrary to or an unreasonable application of clearly established Supreme Court

jurisprudence. See 28 U.S.C. § 2254(d); see also United States v. Jones, 468 F.3d 704, 709 (10th Cir.

2006) ("In itself, a juror's brief view of a defendant in shackles does not qualify as a due process

violation worthy of a new trial."). Grant is not entitled to habeas relief on this claim.

## IV.     Failure to Instruct on Lesser Included Offenses (Ground 4)

Grant claims in his fourth ground for relief that he was denied a fair and reliable trial due to

the trial court's failure to instruct the jury on second degree murder and first degree manslaughter.

Grant claims his mental illness precluded him from forming the specific element of malice

aforethought necessary for a first degree murder conviction and that evidence introduced at trial of

such mental illness warranted instructing on a lesser included offense.  The OCCA rejected this claim

on direct appeal finding the evidence insufficient to support either lesser included offense.  Grant

claims this finding violates both his due process rights pursuant to Beck v. Alabama, 477 U.S. 625

(1980) and a state-created liberty interest.  Respondent contends that the OCCA's conclusion that the

evidence did not support the giving of said instructions was not contrary to, or an unreasonable

application of, Supreme Court law.

The OCCA rejected Grant's claim of error on direct appeal and found as follows:

A defendant cannot be convicted of second-degree murder if the evidence establishes that he acted with a premeditated intent to kill. 21 O.S.1991, § 701.8(1); Williams v. State, 2001 OK CR 9, ¶¶ 23-25, 22 P.3d 702, 712, cert. denied, 534 U.S. 1092, 122 S.Ct. 836, 151 L.Ed.2d 716 (2002). In this case, the evidence clearly establishes a premeditated design to kill. Grant procured a prison-made stabbing instrument, capable of causing fatal injuries. He then waited for Carter to come by the mop closet, where he grabbed her and forced her into the small room. He then stabbed her repeatedly in the area where her vital organs were located. The evidence simply does not support a finding that he acted without a premeditated design to effect death.

First-degree manslaughter requires that a person act with a "heat of passion" caused by "adequate provocation." 21 O.S.2001, § 711. No evidence exists to support either of these elements. Therefore, the trial court did not err in failing to give this requested instruction.

Within this proposition, Grant urges this Court to recognize a "diminished capacity" defense to first degree murder wherein a defendant is incapable of forming the specific intent due to mental illness, yet something less than complete insanity. He compares this type of defense to the intoxication defense.

By accepting this defense, Grant argues that the diminished capacity would lessen the offense to Second Degree "depraved mind" Murder or First Degree Manslaughter. We need not reach the issue of a "diminished capacity" defense in this case, as Grant's evidence regarding his mental illness did not show that he suffered mental infirmities that would have rendered him incapable of forming the specific intent necessary. Cf. Jackson v. State, 1998 OK CR 39, ¶ 67, 964 P.2d 875, 892, cert. denied, 526 U.S. 1008, 119 S.Ct. 1150, 143 L.Ed.2d 217 (1999).

Grant I,  58 P.3d at 795.

   A. Grant's Beck claim

The Due Process Clause of the Fourteenth Amendment ensures that the death penalty may not "be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." Beck, 447 U.S. at 627. The Supreme Court explained that "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense – the

48

failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction" and that "[s]uch a risk cannot be tolerated in a case in which the defendant's life is at stake." Gilson v. Sirmons, 520 F.3d 1196, 1233 (10th Cir. 2008) (quoting Beck, 447 U.S. at 637). The Beck requirement is satisfied so long as the jury had the option of at least one lesser included offense. Schad v. Arizona, 501 U.S. 624, 645-46 (1991).

Under Beck, Grant must satisfy two components. First, Grant must establish that the crime on which the trial court refused to instruct was actually a lesser included offense of the capital crime of which he was convicted. Phillips v. Workman, 604 F.3d 1202, 1210 (10th Cir. 2010) (citing Hogan v. Gibson, 197 F.3d 1297, 1306 (10th Cir. 1999)). Second, he "must show that the evidence presented at trial would permit a rational jury to find him guilty of the lesser-included offense and acquit him of first degree murder." Id. (quoting Young v. Sirmons, 486 F.3d 655, 670 (10th Cir. 2007)); see also Taylor v. Workman, 554 F.3d 879, 888 (10th Cir. 2009) (quoting Hogan, 197 F.3d at 1308) ("The proper inquiry is whether the defendant presented sufficient evidence to 'allow a jury to rationally conclude' that the defendant was guilty of the lesser-included offense"). "Only if there is evidence which tends to negate an element of the greater offense, which would reduce the charge, should instructions on a lesser included offense be given." Gilson, 520 F.3d at 1234 (citing United States v. Scalf, 708 F.2d 1540, 1546 (10th Cir. 1983) and Fairchild v. State, 998 P.2d 611, 627 (Okla. Crim. App. 1999)).

"Under Oklahoma law, all lesser forms of homicide are considered lesser included offenses of first degree murder." Gilson, 520 F.3d at 1234 (citing Shrum v. State, 991 P.2d 1032, 1036 (Okla. Crim. App. 1999)). Thus, both of the offenses cited by Grant, second degree murder and first degree

manslaughter, were and are considered lesser included offenses of first degree murder.  It is undisputed that Grant sought and was denied instructions on  first degree manslaughter at trial.  See Tr. Vol. VI at 1484.  However, Grant failed to request second degree murder instructions. See Dkt. # 12 at 60.  The Tenth Circuit has held, "[A] state prisoner seeking federal habeas relief may not prevail on a Beck claim as to a lesser included instruction that he or she failed to request at trial." Hooks v. Ward, 184 F.3d 1206, 1234 (10th Cir. 1999).  Therefore, Grant meets the first component of a Beck claim with respect to the requested first degree manslaughter instruction, but is not entitled to relief pursuant to Beck, for the trial court's failure to instruct on second degree murder.

Grant, relying on Hogan, 197 F.3d at 1305, argues that the OCCA improperly justified its decision by evaluating the sufficiency of the evidence for first degree murder.  Grant argues that as a result this Court should not defer to the state court's ruling on this issue.  In Hogan, the Tenth Circuit found that the OCCA in reviewing the denial of a lesser included offense instruction improperly examined whether the evidence "was sufficient to support conviction on the greater charge, but *never* engag[ed] in the correct inquiry as to whether Hogan presented sufficient evidence to warrant a first-degree manslaughter instruction."  197 F.3d at 1306 (emphasis in original).  The court held that because the OCCA "made no findings as to whether Hogan had presented sufficient evidence to warrant a first-degree manslaughter instruction, it is axiomatic that there are no findings to which we can give deference. As such, we will consider Hogan's Beck claim on the merits."  197 F.3d at 1306.

In contrast to Hogan, the state court here did make specific findings as to whether Grant presented sufficient evidence to warrant instructions on a lesser included offense.  Grant I,  58 P.3d at 795.  While the state court did find that "[i]n this case, the evidence clearly establishes a

premeditated design to kill," the state court also found that no evidence existed to support the "heat of passion" and "adequate provocation" elements of first degree manslaughter. See id. The state court also specifically found that Grant had not presented sufficient evidence to show that his conduct was done without the intent to kill. See id. ("Grant's evidence regarding his mental illness did not show that he suffered mental infirmities that would have rendered him incapable of forming the specific intent necessary."). Thus, this case is distinguishable from Hogan. The OCCA reached a decision on the merits which was not contrary to, or an unreasonable application of, Beck and its progeny. As a result, this Court must defer to the state court's ruling under the AEDPA.

In analyzing Grant's Beck claim, this Court must consider the elements of both first degree murder and first degree manslaughter in light of the evidence presented at trial. See Malicoat v. Mullin, 426 F.3d 1241, 1253 (10th Cir. 2005). The trial court instructed Grant's jury that the elements of first degree malice aforethought murder are: (1) death of a human; (2) death was unlawful; (3) death was caused by the defendant; and (4) death was caused with malice aforethought. (See O.R. 322). Malice aforethought was further defined as meaning "a deliberate intention to take away the life of a human being." (Id. at 323).

Under Oklahoma law, a person commits first degree heat of passion manslaughter if the homicide is "perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide." Okla. Stat. tit. 21, § 711(2). The elements of heat of passion manslaughter are: "1) adequate provocation; 2) a passion or emotion such as fear, terror, anger, rage, or resentment; 3) homicide occurred while the passion still existed and before a reasonable opportunity for the passion to cool; and 4) a causal connection between the

provocation, passion and homicide." Charm v. State, 924 P.2d 754, 760 (Okla. Crim. App. 1996). Adequate provocation is "any improper conduct of the deceased toward the defendant which naturally or reasonably would have the effect of arousing a sudden heat of passion within a reasonable person in the position of the defendant." Washington v. State, 989 P.2d 960, 968 n. 4 (Okla. Crim. App. 1999).

Upon review of the record, there is no evidence that Grant was adequately provoked nor is there any evidence that he acted as in the "heat of passion" or as a result of "a passion or emotion such as fear, terror, anger, rage, or resentment." The evidence simply did not support the first degree manslaughter instruction he requested. Accordingly, the Court concludes that the OCCA's decision was not an unreasonable application of Beck. See 28 U.S.C. § 2254(d). The trial court's refusal to give the first degree manslaughter instruction does not warrant habeas relief.

*B. State law liberty interest*

Grant also contends that he had a right under state law to instruction on the lesser included offense of second degree murder and that denial of that right violated his liberty interests and the due process of law protected by the Fifth and Fourteenth Amendments. Dkt. # 12 at 62. Grant argues that the denial of a right guaranteed by state law is a denial of a constitutionally protected liberty interest that is appropriate for review by writ of habeas corpus. Id. (citing Hicks v. Oklahoma, 447 U.S. 343, 346 (1980); Ballard v. Estelle, 937 F.2d 453, 456 (9th Cir. 1991)). Indeed, "[s]tate statutes 'may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment,' even when those rights would not exist independent of the statute." Wilson v. Sirmons,  536 F.3d 1064, 1100 (10th Cir. 2008) (quoting Vitek v. Jones, 445 U.S. 480, 488

52

(1980)). "However, 'it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'" Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Grant has cited no authority that establishes that Oklahoma law creates any constitutionally protected liberty interest in receiving a lesser included offense instruction.  Absent a Beck violation, Grant has not established that any other constitutional right is violated by a trial court's failure to give a lesser included offense instruction.  Whether the evidence was sufficient to obligate the trial court to give an instruction on second degree murder absent a request for such an instruction from the defendant is a matter of state law that is not subject to re-examination by this Court.  See id.  The state appellate court noted that, under Oklahoma law, "[i]t is the trial court's duty to instruct the jury on all lesser related offenses that are supported by the evidence, even absent a request from a defendant."  Grant I, 58 P.3d at 795 (citing Shrum v. State, 991 P.2d 1032, 1034 (Okla. Crim. App. 1999)).  "However, the trial court is only required to instruct on lesser offenses that are reasonably supported by the evidence."  See id. The trial court should not "ask a jury to consider a lesser offense if no jury could *rationally* find both that the lesser offense was committed and that the greater offense was not."  See id. (citing Frederick v. State, 37 P.3d 908, 943-44 (Okla. Crim. App. 2001) (emphasis in original)).  The OCCA found that "Grant argues that the diminished capacity would lessen the offense to Second Degree 'depraved mind' Murder or First Degree Manslaughter. Grant's evidence regarding his mental illness did not show that he suffered mental infirmities that would have rendered him incapable of forming the specific intent necessary."  Grant I, 58 P.3d at 795  Grant has failed to demonstrate that Oklahoma law has created any constitutionally protected liberty interest in lesser included offense instructions, and thus, habeas review of the OCCA's determination on this issue is not appropriate.  Grant has failed to establish that the OCCA's determination on this issue was

contrary to, or an unreasonable application of, established federal law or based on an unreasonable determination of the facts in light of the evidence.  See 28 U.S.C. § 2254(d).

Grant is denied habeas relief on his ground four claim.

## V.    Duplicative Aggravating Circumstances (Ground 5)

Grant contends his constitutional rights were violated because evidence of the same prior felony convictions was used by the State to support both the following aggravators: (1) Grant had been previously convicted of felony offenses involving the use or threat of violence; and (2) the crime was committed while Grant was incarcerated on conviction of a felony.  Grant claims that the "prior violent felony" aggravator and the "incarceration" aggravator are duplicative and skewed the weighing process resulting in an arbitrary sentence of death in violation of the Eighth and Fourteenth Amendments. See Dkt. # 12 at 83.   In disposing of Grant's direct appeal, the OCCA rejected this argument as follows:

> Grant complains in proposition eleven that the use of his prior convictions to prove two aggravating circumstances, "prior violent felony" and "murder committed by a person incarcerated on conviction of a felony," resulted in duplicitous aggravating circumstances which skewed the weighing process. We addressed this issue in Green v. State, 1985 OK CR 126, ¶ 26, 713 P.2d 1032, 1040-41, cert. denied 479 U.S. 871, 107 S.Ct. 241, 93 L.Ed.2d 165 (1986), overruled on other grounds by Brewer v. State, 1986 OK CR 55, ¶ 51, 718 P.2d 354, 365, n. 1. In Green we stated that the two aggravating circumstances complained of here cover different aspects of a defendant's criminal history. One aggravating circumstance focuses on a defendant's pattern of violent criminal history while the other focuses on his conduct while in prison. Green, 1985 OK CR 126, ¶ 26, 713 P.2d at 1042. We find that our reasoning in Green is sufficient for determination of this issue and we will not revisit our decision. There was no error in using evidence of Grant's robbery convictions to support both of these aggravating circumstances.

> Grant I,  58 P.3d at 795-96.

Notably, Grant acknowledges that the Supreme Court has not addressed these issues. Dkt. # 12 at 68.   Instead, he relies primarily on a case from the Tenth Circuit, United States v. McCullah,

76 F.3d 1087 (10th Cir. 1996). In McCullah, the court held that "double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally." Id. at 1111. Such precedent does not, however, stand for the proposition that any time evidence supports more than one aggravating circumstance, those circumstances impermissibly overlap, per se.

The Tenth Circuit has repeatedly held that McCullah does not prohibit the use of the same evidence in support of more than one aggravator. See Patton v. Mullin, 425 F.3d 788, 809 (10th Cir. 2005) (concluding that "prior violent felony" aggravator and the aggravating circumstance that the murder was committed while defendant was on parole for felony convictions did not subsume each other even though same felony convictions were used); Medlock v. Ward, 200 F.3d 1314, 1319 (10th Cir. 2000); Trice v. Ward, 196 F.3d 1151, 1173-74 (10th Cir. 1999); Cooks v. Ward, 165 F.3d 1283, 1289 (10th Cir. 1998). "The test we apply is not whether certain evidence is relevant to both aggravators, but rather, whether one aggravating circumstance 'necessarily subsumes' the other." Cooks, 165 F.3d at 1289 (quoting McCullah, 76 F.3d at 1111).

As previously stated, the AEDPA requires the application of Supreme Court precedent in determining whether the state court proceeding violated clearly established federal law. See 28 U.S.C. § 2254(d)(1). Because there is no Supreme Court precedent regarding duplicative aggravating circumstances,[16] this Court must deny habeas relief on this basis. However, even assuming arguendo that the AEDPA standards allow Grant to rely on a circuit court case such as McCullah as a basis for

---

[16]    See Jones v. United States, 527 U.S. 373, 398 (1999) (noting that it has "never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor have we passed on the 'double counting' theory that the Tenth Circuit advanced in McCullah").

federal habeas relief, it is apparent the jury in Grant's case did not "double count" aggravating factors and that the two aggravating factors at issue here did not "necessarily subsume" each other. See Cooks, 165 F.3d at 1289. The two aggravating factors at issue focused on different aspects of Grant's conduct. The "prior conviction of a violent felony" aggravator focused solely on Grant's past criminally violent behavior and the resulting convictions. See id. In contrast, the "incarceration" aggravator focused on Grant's conduct while he was imprisoned on a sentence from a felony conviction. See id. The aggravating factors of being under sentence of imprisonment and being previously convicted of another felony involving violence do not cover the same aspect of Grant's criminal history. A criminal defendant could be under a sentence of imprisonment without having been convicted of a felony involving violence. Also, a defendant could have been previously convicted of a felony involving violence without being under a sentence of imprisonment. These aggravating circumstances are separate and inclusion of the two factors in the weighing process does not constitute a double counting of aggravating circumstances.   The fact that two aggravating circumstances rely on some of the same evidence does not render them duplicative. See Patton, 425 F.3d at 808-09.

Because the OCCA's rejection of this issue was not an unreasonable application of clearly established federal law, Grant is not entitled to habeas corpus relief on this claim.

## VI.   Victim Impact Evidence (Ground 6)

In ground six, Grant claims the victim impact statements were unconstitutional under the parameters established in Payne v. Tennessee, 501 U.S. 808 (1991). Specifically, he urges that the request for the death penalty contained within the victim impact statements violated Grant's due process rights to a fair trial. See Dkt. # 12 at 87.   Respondent concedes that the admission of the

victim's family members' requests to give Grant the death penalty was constitutional error but argues that the error was harmless.

The OCCA denied Grant's claim of error on direct appeal as follows:

> This Court has previously held that a victim impact statement that contains a belief that the defendant should receive death penalty is admissible, but it must be a simple statement of the recommended sentence without amplification. Conover, 1997 OK CR 6, ¶ 70, 933 P.2d at 921; Ledbetter, 1997 OK CR 5, ¶ 31, 933 P.2d at 891. That is exactly what we have here. We find that this short statement did not undermine the reliability of the sentence imposed.

Grant I, 58 P.3d at 798. This Court finds that the OCCA's determination that a victim impact statement that contains simple statement that the defendant should receive the death penalty is admissible is an erroneous interpretation of well-settled Supreme Court law.

If a state chooses to allow the admission of victim impact evidence, the Eighth Amendment erects no per se bar. "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." Payne, 501 U.S. at 827. In overruling its own previous split decisions in Booth v. Maryland, 482 U.S. 496 (1987) and South Carolina v. Gathers, 490 U.S. 805 (1989), the Supreme Court observed that assessment of the harm caused by the defendant has long been an important factor in determining the appropriate punishment, and victim impact evidence is simply another method of informing the sentencing authority about such harm. Payne, 501 U.S. at 820, 825. Noting that such statements are "evidence of a general type long considered by the sentencing authorities," the Payne Court concluded that in most cases, "victim impact evidence serves entirely legitimate purposes." Id. at 825. Although not constitutionally barred, victim impact statements remain subject to certain restrictions and limitations. Victim impact evidence cannot be "so unduly prejudicial that it renders the trial fundamentally unfair" in violation of the Due Process

57

Clause of the Fourteenth Amendment. <u>Short v. Sirmons</u>, 472 F.3d 1177, 1192 (10th Cir. 2006) (quoting <u>Turrentine v. Mullin</u>, 390 F.3d 1181, 1200 (10th Cir. 2004)). In 1992, Oklahoma enacted legislation permitting victim impact evidence. <u>See</u> Okla. Stat. tit. 21, § 701.10(c) (1992),[17] and Okla. Stat tit. 22, §§ 984, 984.1 (1992).

Two family representatives read victim impact statements to the jury. Ms. Carter's sister read a statement on behalf of Ms. Carter's daughter in which she stated, "I believe that John Marion Grant should receive the death penalty." Tr. Vol. VI at 1555. A statement was read on behalf of Ms. Carter's brother that also requested death: "I believe John M. Grant should be given the death penalty." <u>Id.</u> at 1557. Grant challenges the constitutionality of the victims' requests that he be given the death penalty. Significantly, in overruling <u>Booth</u>, the Supreme Court left one portion untouched. The Tenth Circuit has joined other circuits in recognizing "that the portion of <u>Booth</u> prohibiting family members from stating 'characterizations and opinions about the crime, the defendant, and the appropriate sentence' during the penalty phase of a capital trial survived the holding in <u>Payne</u> and remains valid." <u>Hain v. Gibson</u>, 287 F.3d 1224, 1238-39 (10th Cir. 2002). Thus, the requests by the victim's family members to give Grant the death penalty were improperly admitted and constitute a violation of his Eighth Amendment rights. <u>See id.</u> at 1239.

The remaining question is whether the error was harmless. If constitutional error is committed at trial, this Court looks to whether the prejudicial impact of the error rises to the "substantial and injurious effect" standard set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993), and <u>O'Neal v. McAninch</u>, 513 U.S. 432 (1995).

---

[17]    Section 701.10 (c) of Title 21 provides, "[i]n the sentencing proceeding, . . . the state may introduce evidence about the victim and about the impact of the murder on the family of the victim."

Several factors convince the Court that admission of the improper victim impact evidence was harmless error which does not warrant habeas relief. First, the evidence of Grant's guilt was overwhelming and undisputed. Second, the jury found the existence of three aggravating circumstances beyond a reasonable doubt before sentencing Grant to death. The jury found, based upon the evidence, that Grant was previously convicted of a felony involving the use or threat of violence to the person; that Grant committed the murder while serving a sentence of imprisonment on conviction of a felony; and the existence of a probability that Grant would commit criminal acts of violence that would constitute a continuing threat to society. The evidence supporting the three aggravating circumstances, independent of the victim impact evidence, was ample. Thus, the victim impact evidence was not so unduly prejudicial that it rendered Grant's sentencing trial fundamentally unfair. Accordingly, this Court concludes that the admission of the improper aspects of the victim impact evidence was harmless error. See Welch v. Sirmons, 451 F.3d 675, 704 (10th Cir. 2006), abrogated on other grounds by Wackerly v. Workman, 580 F.3d 1171 (10th Cir. 2009).

Because the OCCA's rejection of this issue was not an unreasonable application of clearly established federal law, Grant fails to qualify for habeas corpus relief on his ground six claim.

## VII.    Constitutionality of Continuing Threat Aggravator (Ground 7)

Grant claims in Ground 7 that the "continuing threat" aggravator is unconstitutionally vague and overbroad and, as applied, violates the Eighth and Fourteenth Amendment requirements of an individualized sentencing.  The OCCA on direct appeal rejected Grant's argument stating, "We have repeatedly upheld the constitutionality of this aggravating circumstance and will not revisit this issue here."   Grant I,  58 P.3d at 796 (citing Myers v. State, 17 P.3d 1021, 1036-37 (Okla. Crim. App. 2002)).

59

Similarly, Tenth Circuit precedent forecloses Grant's facial challenge to Oklahoma's continuing threat aggravator as unconstitutional. Sallahdin v. Gibson, 275 F.3d 1211, 1232 (10th Cir. 2002); see also Medlock v. Ward, 200 F.3d 1314, 1319 (10th Cir. 2000) (noting that the Tenth Circuit has repeatedly upheld the facial constitutionality of the continuing threat aggravator as narrowed by the State of Oklahoma); Nguyen v. Reynolds, 131 F.3d 1349, 1352-53 (10th Cir. 1997) (citing Tuilaepa v. California, 512 U.S. 967, 972 (1994)) ("Because the continuing threat factor is neither unconstitutionally vague nor applicable to every defendant convicted of murder in the first degree, it is properly used during both the eligibility decision and the selection decision.").  Grant does not make any argument which compels or permits this Court to disregard the binding precedent. Accordingly, habeas relief must be denied on this issue.

Grant also states in the title to this ground seven claim that the "continuing threat" aggravating circumstance was unconstitutional as applied at his sentencing trial. He provides no argument to support this claim in the body of his brief. The Court will summarily deny his claim on the merits as Grant presents no argument to allow the Court to analyze the claim.

Grant fails to qualify for habeas corpus relief on his ground seven claim.

## VIII.   Confrontation Clause Violation (Ground 8)

In his ground eight claim, Grant argues that his constitutional right to confront and cross-examine witnesses against him was violated when the trial court limited his cross-examination of Dr. Frederick Smith. The OCCA on direct appeal determined that the trial court erred in limiting the cross-examination but found that the trial court's ruling was harmless beyond a reasonable doubt. Grant I, 58 P.3d at 795. Respondent does not dispute that the trial court erred in limiting cross-

examination but argues that the OCCA's decision that the limited cross-examination was harmless error is not contrary to or an unreasonable application of established federal law.

Dr. Smith was called by the State as a rebuttal witness to the defense's evidence that Grant was in a delusional or psychotic state of mind at the time of the offense. Dr. Smith testified that he reviewed all of Grant's medical and mental health records maintained by the Department of Corrections, including a report by Dr. Elliot Mason. See Grant I, 58 P.3d at 794. Dr. Smith indicated on cross-examination that his opinion about Grant's state of mind was based, in part, on Dr. Mason's report. See, e.g., Tr. Vol. VI at 1409-10, 1418, 1432-34, 1428. Dr. Smith concluded that he did not see any evidence of mental illness present with Grant. See id. at 1430. On redirect, the prosecution asked Dr. Smith if Grant suffered from paranoid ideation and Dr. Smith indicated he did not. See id. at 1433-34. On re-cross-examination, Grant attempted to question Dr. Smith about a portion of the report by Dr. Mason which contained Grant's statement to Dr. Mason that he thought the security people were contaminating his food. Id. at 1440. Defense counsel, before objection by the State, attempted to ask Dr. Smith if he just missed that part of the report. The trial court ruled that the questioning was beyond the scope of direct examination. Id. at 1440-42.

On direct appeal, the OCCA found as follows:

> Part of Dr. Smith's testimony dealt directly with the issue of whether Grant exhibited any signs of having delusions. Smith testified that he had reviewed Dr. Mason's report before reaching his conclusions. The statement by Grant in Dr. Mason's report contradicted part of Dr. Smith's opinion that Grant exhibited no signs of having delusions. "The extent of cross-examination rests in the discretion of the trial court and reversal is only warranted where there is an abuse of discretion resulting in prejudice to the defendant." Parker v. State, 1996 OK CR 19, ¶ 13, 917 P.2d 980, 984, cert. denied, 519 U.S. 1096, 117 S.Ct. 777, 136 L.Ed.2d 721 (1997).

> "As a general rule, any matter is a proper subject of cross examination which is responsive to testimony given on direct examination or which is material or relevant thereto and which tends to elucidate, modify, explain, contradict or rebut

testimony given in chief by the witness." <u>Smith v. State</u>, 1985 OK CR 17, ¶ 14, 695 P.2d 864, 868.

Applying these general rules to the present case, we find that the attempted cross-examination was not beyond the scope of direct examination, and the trial court should have allowed the inquiry. However, prejudice must be shown. There was no prejudice to Grant resulting from the trial court's ruling in this case.

There had been no history of delusional behavior in the seventeen years that Grant had been in D.O.C. custody. The failure to allow cross-examination on this single, self-serving statement made three days after Grant murdered the kitchen worker and contained in a second-hand report had no impact on the jury's determination of guilt or the sentence in this case. Therefore, we find that the trial court's ruling was harmless beyond a reasonable doubt.

<u>Grant I</u>, 58 P.3d at 794-95.

In determining what evidence to admit, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679 (1986). The Confrontation Clause does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defendant might wish." <u>Id.</u> To demonstrate a constitutional violation, a petitioner must show "that the evidence, if admitted, would have created reasonable doubt that did not exist without the evidence." <u>Patton v. Mullin</u>, 425 F.3d 788, 797 (10th Cir. 2005) (citing <u>United States v. Valenzuela-Bernal</u>, 458 U.S. 858, 868 (1982)).

The Supreme Court has recognized that a defendant's right to confront the witnesses against him is central to the truthfinding function of the criminal trial, nonetheless, Confrontation Clause violations are subject to harmless-error review. <u>Van Arsdall</u>, 475 U.S. at 679, 684. When a federal court considers a Confrontation Clause violation in a habeas proceeding, the relevant harmless error analysis is "whether, assuming that the damaging potential of the cross-examination were fully

realized, a reviewing court might nonetheless say that the error," id. at 684, "had substantial and injurious effect or influence in determining the jury's verdict," Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993) (quotation marks omitted).  In reviewing for harmless error, the Court must examine "the entire record to determine the error's possible effect on the jury." Jones v. Gibson,  206 F.3d 946, 957 (10th Cir. 2000) (citation omitted).  According to the Supreme Court,

> Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

Van Arsdall,  475 U.S. at 684 (1986) (citations omitted).

This Court agrees with Grant and the OCCA that the trial court erred in refusing to allow Grant's counsel to question Dr. Smith regarding the statement by Grant in Dr. Mason's report that his food was being contaminated.  Respondent does not dispute this finding. See Dkt. # 18 at 43. Thus, the relevant analysis for the Court is "whether, assuming that the damaging potential of the cross-examination [of Dr. Smith] were fully realized," the error "had substantial and injurious effect or influence in determining the jury's verdict," See Van Arsdall,  475 U.S. at 684; Brecht, 507 U.S. at 637-38 (quotation omitted); see also Fry v. Pliler, 551 U.S. 112, 121 (2007) ("We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht . . . . whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard . . . .").  In doing so, the Court is informed by the factors enumerated in Van Arsdall.

Two areas of inquiry suggest the error was not harmless. Dr. Smith's testimony was not cumulative. Nor was there any significant evidence to corroborate or contradict Dr. Smith's testimony regarding his conclusion that Grant did not exhibit any earmarks of mental instability when he was interviewed shortly after the offense.  Dr. Smith was one of only two mental health workers who had the opportunity to see Grant shortly after he killed Ms. Carter (the other being Dr. Mason who was not presented).

Nonetheless, the remaining areas of inquiry strongly support the conclusion that the error was harmless. Dr. Smith was not a particularly important witness in the prosecution's case, as demonstrated by the fact that he was a rebuttal witness, not a part of the prosecution's case in chief. Also, defense counsel was permitted to extensively cross-examine Dr. Smith.  Grant's counsel carefully cross-examined Dr. Smith regarding his qualifications, the limited amount of time he spent assessing Grant immediately after the crime, and the fact that he did not deliver any psychiatric or psychometric tests. See Tr. Vol. V at 1407-1435.  The jury was able to observe his demeanor and assess his credibility with respect to his findings regarding Grant's mental state. Certainly his credibility could have been scrutinized more closely if the jury had heard why Dr. Smith discounted or ignored Dr. Mason's notation regarding Grant's post-offense statement that he believed his food was being contaminated. However, nothing in the record indicates, beyond mere speculation, that Dr. Smith was a biased witness.

Finally, the evidence of Grant's guilt was strong.  The state presented a strong case demonstrating Petitioner's premeditated design to kill Ms. Carter including eye witnesses to the attack.  See Grant I, 58 P.3d at 789. Also the record shows that Grant threatened Ms. Carter the day before the murder as well as the day of the murder.  See id.  The record shows that Grant stabbed Ms.

Carter sixteen times with a prison made shank while holding her mouth closed. See id. By contrast, the evidence of his insanity was not strong.  Grant testified that he had no memory of the murder. Tr. Vol. V at 1374.  Grant's expert witness, Dr. Montgomery, examined Grant on January 21, 2000, a little over a year after Ms. Carter's murder.  Tr. Vol. V at 1320.  Dr. Montgomery  merely testified that Grant had a borderline personality disorder that could cause him to behave "in a manner similar to psychotic patients from time to time, especially under stress." Tr. Vol. V at 1348-49.   Dr. Montgomery testified that he did not know if Grant understood the nature and consequences of his acts when he committed the murder because he did not see Grant at that time.  Tr. Vol. V at 1355.  He also testified that Grant knew right from wrong. Tr. Vol. V at 1354.  One defense witness described Grant as having a "vacant stare" or a "void, blank look" at the time of the crime. Tr. Vol. V at 1249.

Considering the evidence as a whole, this Court concludes the error in limiting cross-examination was harmless. It is unlikely the restriction on cross-examination had a substantial effect or influence on the jury's verdict.  See Jones v. Gibson, 206 F.3d 946, 957-58 (10th Cir. 2000). Grant has not established that he is entitled to habeas relief on his ground eight claim.

## IX.    Failure to instruct jury that aggravating circumstances must outweigh the mitigating circumstances beyond a reasonable doubt (Ground 9)

Grant alleges that Oklahoma's sentencing scheme for death penalty cases violates the Sixth, Eighth, and Fourteenth Amendments. Grant's particular complaint is that the jury in his case was not required to find beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances. In support of his claim, Grant cites Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002).

The OCCA rejected Grant's claim of error in his first post-conviction proceedings. See Order Denying Post-Conviction Relief, Case No. PCD-2002-347 (April 14, 2003).

In Matthews v. Workman, 577 F.3d 1175 (10th Cir. 2009), an Oklahoma capital habeas petitioner, relying on both Apprendi and Ring, argued that his jury should have been instructed to find that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. See id. at 1195. Without this determination, Matthews argued his death sentence was invalid. Relying on its decision in United States v. Barrett, 496 F.3d 1079, 1107 (10th Cir. 2007), the Tenth Circuit found no merit to the claim. In particular, the court found that the jury's weighing of the factors in aggravation and mitigation "is not a finding of fact subject to Apprendi but a 'highly subjective, largely moral judgment regarding the punishment that a particular person deserves.'" Matthews, 577 F.3d at 1195 (quoting Barrett, 496 F.3d at 1107). In accordance with Matthews, Grant's ground thirteen claim is denied.

## X.      Second Stage Instructional Error (Ground 10)

Grant argues in ground ten that the instruction on mitigation permitted the jury to choose to ignore mitigating evidence. Instruction Number 2-9, the disputed instruction, provided in pertinent part: "Mitigating circumstances are those which, in fairness and mercy, may extenuate or reduce the degree of moral culpability or blame. The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case." O.R. 366.

The OCCA rejected Grant's claim of error on direct appeal noting, "We have consistently rejected the claim that instructing the jury they 'may consider' mitigating evidence creates a doubt as to the jury's constitutional duty to consider such evidence . . . ." Grant I, 58 P.3d at 798.

66

"The Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by petitioner." Boyde v. California, 494 U.S. 370, 377-78 (1990). The standard for determining whether the jury instructions, which must be viewed in total, Cupp v. Naughten, 414 U.S. 141, 146-47 (1973), satisfy these principles is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde, 494 U.S. at 380; see also Buchanan v. Angelone, 522 U.S. 269, 276 (1998). A state, however, need not structure in a particular way the manner in which juries consider mitigating evidence. Buchanan, 522 U.S. at 276.

This Court rejects Grant's argument. First, Grant speciously argues that the above quoted instruction gives the jury a "may consider" option with regard to mitigating circumstances. Instruction Number 2-9 does not contain the permissive "may consider" language which Grant asserts it does. See Dkt. # 12 at 99. Next, to the extent Grant claims that the "jury was told that they should consider only such evidence that 'may extenuate or reduce the degree of moral culpability'" (Dkt. # 12 at 98), Instruction Number 2-9 also tells the jury that what is to be considered mitigating is for them to decide. This statement broadens any limitations placed on the mitigating evidence through the first sentence. The jury was also instructed in Instruction Number 2-10 that evidence had been introduced of two enumerated mitigating circumstances and that "[i]n addition, you may decide that other mitigating circumstances exist, and if so, you should consider those circumstances as well." O.R. 367. Finally, the jury was instructed in Instruction Number 2-11 that they could not impose the death penalty unless they unanimously found that the aggravating circumstances outweighed the mitigating circumstances. O.R. 368.

Here, Grant has failed to specifically set forth any relevant mitigating evidence which the jury was precluded from considering. Having reviewed Instruction Number 2-9 in its entirety and in context of the other instructions provided to the jury, this Court finds there is not a reasonable likelihood that the jury would have applied Instruction No. 2-9 in a way that prevented them from considering any relevant mitigating evidence. See Boyde, 494 U.S. at 380. Having failed to demonstrate that the OCCA's finding was an unreasonable application of Supreme Court law, Grant is not entitled to relief on this issue.

## XI.  Accumulation of Error (Ground 11)

Grant next contends he was denied a fair trial and a reliable sentencing process because of the impact of the accumulation of errors. Dkt. # 12 at 101. Grant exhausted this claim by asserting cumulative error on direct appeal. The OCCA denied relief finding that the errors it identified, even viewed in a cumulative fashion, did not require relief. Grant I, 58 P.3d at 801.

Cumulative error analysis "merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Hamilton v. Mullin, 436 F.3d 1181, 1196 (10th Cir. 2006) (internal quotations omitted) (citing Workman v. Mullin, 342 F.3d 1100, 1116 (10th Cir. 2003)).  This Court has reviewed the identified trial errors together to determine if the accumulation rendered Grant's trial unfair.  The Court cannot find under the facts of this case that the cumulative effect of the errors had a "substantial and injurious effect or influence in determining the jury's verdict." Fry v. Pliler, 551 U.S. 112, 121

(2007); <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).[18]  The Court finds Grant has shown no cumulative error warranting a new trial.

## XII.    Constitutionality of Oklahoma's Lethal Injection Protocols (Ground 12)

Grant challenges Oklahoma's lethal injection protocols claiming the procedure set forth by the Oklahoma Department of Corrections violates the Fifth, Eighth and Fourteenth Amendments by subjecting him to cruel and unusual punishment.  Grant claims that the lethal injection protocols create a substantial risk that he will consciously suffer while he is being suffocated and experience excruciating pain because there is no assurance that Oklahoma's procedure will render him unconscious during the execution.  <u>See</u> Dkt. # 12 at 110.[19]  Respondent argues that Grant has not presented his claim to the state courts and it is, therefore, unexhausted.  Respondent urges the Court to apply anticipatory procedural bar and refuse to consider the claim on the merits.

---

[18]    Grant contends that this Court must review the OCCA's determination of harmlessness de novo rather than apply AEDPA deference.  Because this Court must assess the prejudicial impact of errors under the <u>Brecht</u> "substantial and injurious effect" standard regardless of "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard," it is immaterial whether this Court's review is considered "de novo" or under the AEDPA standard.  <u>See</u> <u>Fry</u>, 551 U.S. at 119-21.

[19]    Grant did not raise, and this Court does not address, the recent approval of the substitution of pentobarbital for sodium thiopental in Oklahoma's lethal-injection formula should sodium thiopental be unavailable at the time of an execution. <u>See</u> Memorandum and Order, ECF No. 102, <u>Pavatt v. Jones</u>, Case No. CIV-10-141-F (W.D. Okla. November 22, 2010) (denying injunctive relief to intervenors Matthews and Duty who sought to enjoin their executions due to the substitution of pentobarbital on Eighth Amendment grounds). Moreover, it is premature to assume that sodium thiopental will be unavailable at the time of Grant's execution.  <u>See</u> Defendants' Trial Brief, ECF No. 93 at 3, <u>Pavatt v. Jones</u>, Case No. CIV-10-141-F (W.D. Okla. November 12, 2010) (indicating that the DOC's new protocol allows the use of either sodium thiopental or pentobarbital but that the DOC continues in its efforts to obtain sodium thiopental).

Given the nature of Grant's claim, a preliminary question exists as to whether it is cognizable in this action or more properly maintained as a civil rights action pursuant to 42 U.S.C. § 1983. Recent decisions from the Supreme Court, Hill v. McDonough, 547 U.S. 573 (2006), and Nelson v. Campbell, 541 U.S. 637 (2004), have acknowledged that Section 1983 is a viable avenue for litigation of such claims. However, as the Tenth Circuit has recently acknowledged, "[n]either the Supreme Court nor this Circuit has definitively resolved whether claims challenging the specific method of execution may never be considered in a habeas proceeding." Duty v. Workman, No. 07-7073, 2010 WL 533117, at *11 (10th Cir. Feb.12, 2010). Duty did not resolve the issue, but denied habeas relief upon application of anticipatory procedural bar to the claim. Id. at *11-12.

In addition to the matter of the proper forum for Grant's claim, there is a question as to whether the claim should be deemed procedurally barred. Grant concedes he did not raise this claim in state court. Respondent argues that anticipatory procedural bar should be applied. Grant has countered that the bar should not be applied due to inadequacy and because resort to state remedies would be futile. Dkt. # 24 at 36-40.

"Where an issue 'may be more easily and succinctly affirmed on the merits,' judicial economy counsels in favor of such a disposition." Smith v. Mullin, 379 F.3d 919, 927 (10th Cir. 2004) (citation omitted). Such is the case here. Without deciding the proper forum for Grant's claim and the matter of procedural bar, the Court finds that the claim should be denied on the merits.

Grant's overriding concern with Oklahoma's lethal injection protocol is the lack of assurance that it will render him unconscious for the duration of the procedure. Grant alleges that flaws in the protocol, including the use of untrained personnel, types of drugs used, dosages and sequence of the drugs, and use of two alternating intravenous lines, create an unreasonable risk of a torturous

70

execution. As Grant's concerns have been addressed by both Tenth Circuit and Supreme Court authority, the Court finds that his constitutional claim of cruel and unusual punishment must fail.

In <u>Patton v. Jones</u>, 193 Fed. Appx. 785 (10th Cir. 2006), the Tenth Circuit reviewed a Section 1983 challenge to Oklahoma's lethal injection protocol. Patton's complaints mirrored the allegations now raised by Grant. <u>Patton</u>, 193 Fed. Appx. at 787.  During the pendency of the case, however, Oklahoma responded to some of the concerns raised and revised its protocol. In particular, it altered the sequence of the drugs, increased the anesthetic dose, and incorporated a two-and-a-half minute delay between injection of the anesthetic and injection of the paralytic agent. <u>Id.</u> at 789. In upholding the district court's determination that Patton had failed to establish a significant possibility of success on the merits of his Eighth Amendment claims, especially given the revised protocol, the Court agreed with the district court's conclusion "that the critical question . . . 'is not what is optimally desirable,' as, for example, in a surgical setting, but rather 'what is minimally required' to avoid a violation of the Eighth Amendment." <u>Id.</u> at 790 (citation omitted).

In <u>Hamilton v. Jones</u>, 472 F.3d 814 (10th Cir. 2007), the Tenth Circuit addressed another challenge to Oklahoma's lethal injection protocol and once again found that the objections raised fell short of making a successful Eighth Amendment claim. The Court detailed the post- <u>Patton</u> protocol as follows:

> Oklahoma's lethal-injection protocol provides in pertinent part that (1) bilateral intravenous fluid drips ("IVs") will be established in the veins of the inmate's arms by "an EMT-P or person with similar qualifications and expertise in IV insertion," (2) the EMT-P "will ensure the patency [of the IV] until the time of execution by slow infusion of normal saline or dextrose," (3) the drugs are then introduced bilaterally, starting with 1200 mg doses of sodium thiopental, an ultrafast-acting barbituate, to anesthetize the inmate and render him unconscious, followed two and one-half minutes later by 20 mg doses of vecuronium bromide to induce paralysis, and then 100 mg doses of potassium chloride to stop the heart and

cause death; and (4) if only one IV can be established and confirmed as patent, both doses of each drug are administered serially through that IV.

Hamilton, 472 F.3d at 816 (footnote omitted). While noting that the primary criticism of the procedure is the lack of monitoring to ensure effective anesthetization, the Court agreed with the district court that the precautions in place were sufficient and "that the risk of failure that this kind of monitoring would address was simply far too remote to rise to a constitutional level so as to require that it be done in connection with executions." Id. at 817.

> Thus, while monitoring of anesthetization level is the optimal practice appropriate for a surgical operating room (where, significantly, lower doses of anesthetic are used in order to minimize post-surgical "emergence" complications that have no counterpart in the execution setting), the risk inherent in the lethal-injection procedure under review is already so attenuated that we cannot say there is a significant likelihood that a challenge to the protocol under the minimal requirements imposed by the Eighth Amendment on executions could succeed on our record.

Id. The Court also found that Oklahoma's use of an EMT-P to establish and confirm the patency of the IV was acceptable, as EMT-P's are expressly recognized professionals qualified for this purpose. Id.

In addition to Patton and Hamilton, the Supreme Court's decision in Baze v. Rees, 553 U.S. 35 (2008) (plurality opinion), weighs against Grant. In Baze, the Supreme Court upheld Kentucky's lethal injection protocol against an Eighth Amendment challenge. 553 U.S. at 47. Kentucky, like Oklahoma, 28 other states, and the federal government, uses a similar combination of three drugs in their lethal injection protocols. Id. at 44, 53. As noted by the Court, "[t]he proper administration of the first drug ensures that the prisoner does not experience any pain associated with the paralysis and cardiac arrest caused by the second and third drugs." Id. at 44.

As in <u>Patton</u> and <u>Hamilton</u>, the Court in <u>Baze</u> addressed concerns like those raised by Grant. <u>Id.</u> at 54-59. In concluding that these concerns did not rise to the level of cruel and unusual punishment, the Court noted that "[s]ome risk of pain is inherent in any method of execution-no matter how humane-if only from the prospect of error in following the required procedure. It is clear, then, that the Constitution does not demand the avoidance of all risk of pain in carrying out executions." <u>Id.</u> at 47. "Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." <u>Id.</u> at 50. The Court concluded that:

> Kentucky has adopted a method of execution believed to be the most humane available, one it shares with 35 other States. Petitioners agree that, if administered as intended, that procedure will result in a painless death. The risks of maladministration they have suggested-such as improper mixing of chemicals and improper setting of IVs by trained and experienced personnel-cannot remotely be characterized as "objectively intolerable." Kentucky's decision to adhere to its protocol despite these asserted risks, while adopting safeguards to protect against them, cannot be viewed as probative of the wanton infliction of pain under the Eighth Amendment.

<u>Id.</u> at 62.

Most recently in <u>Wackerly v. Jones</u>, No. 10-6237, 2010 WL 3965929 (10th Cir. Oct. 12, 2010), the Tenth Circuit again upheld Oklahoma's lethal injection protocol and noted that "the Supreme Court's approval of a substantially similar protocol in <u>Baze</u> only confirms our decision in <u>Hamilton</u> . . . ." <u>Id.</u> at * 1.

In light of <u>Patton</u>, <u>Hamilton</u>, <u>Baze</u>, and <u>Wackerly</u>, the Court finds that Grant's challenge to Oklahoma's lethal injection protocol is without merit. Grant's ground twelve claim is therefore denied.

**XIII.   Request for Evidentiary Hearing**

In his request for relief (Dkt. # 12 at 114), Grant asks for an evidentiary hearing "as to the Petition as a whole and particularly as to any issues which involve facts not apparent from the existing record" and "to any issues which involve facts disputed by the state." Id.; see also Dkt. # 39 at 22. As the disposition of Grant's habeas corpus petition does not require reference to any materials beyond those that are available and currently before the Court, this Court finds that there is no need for an evidentiary hearing in this case. There are no disputed factual questions remaining that could possibly entitle Grant to habeas corpus relief. Grant has failed to demonstrate the need for an evidentiary hearing under either 28 U.S.C. § 2254(e)(2) or any other governing principle of law. Williams v. Taylor, 529 U.S. 420 (2000). Accordingly, Grant's request for an evidentiary hearing is denied.

## CONCLUSION

After careful review of the record in this case, the Court concludes that John Marion Grant has not established that he is in custody in violation of the Constitution or laws or treaties of the United States.  His Petition for Writ of Habeas Corpus shall be denied.

**ACCORDINGLY IT IS HEREBY ORDERED** that:

1.   Randall G. Workman is substituted for Marty Sirmons as the party respondent and the **Court Clerk is directed** to note such substitution on the record.

2.   Grant's Petition for Writ of Habeas Corpus, as supplemented (Dkt. #s 12, 39) is denied.

3.   A separate judgment shall be entered in this matter.

SO ORDERED THIS 2nd day of December, 2010.

_Terence C. Kern_

TERENCE C. KERN
UNITED STATES DISTRICT JUDGE